DeLOIS VALLERY, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 36586

May 17, 2002 46 P.3d 66

*Lee T. Hotchkin Jr.,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Joseph R. Plater III,* Deputy District Attorney, Washoe County, for Respondent.

---

# OPINION

*Per Curiam:*

Appellant, DeLois Vallery, was convicted of one count of neglect of the elderly causing substantial bodily harm and two counts of neglect of the elderly causing death resulting from her failure to take action to prevent neglect of, or to properly supervise, elderly persons residing in residential group care facilities administered by her. Vallery now appeals on several grounds. However, the primary focus of her appeal involves the construction of different versions of NRS 200.5099, Nevada's older person abuse prevention statute.

For the reasons set forth below, we conclude that the jury was improperly instructed on Count I, neglect of the elderly causing substantial bodily harm. Count I involved an offense committed before the effective date of the 1995 amendments to NRS 200.5099. We will refer to that statute as the 1993 version of the statute. Counts II and III (neglect of the elderly causing death) involved events that occurred subsequent to the effective date of the 1995 amendments to the statute.[1]

The 1993 statute requires the State to prove that an individual actually knew that an older person needed care or assistance and failed to provide the necessary care or assistance. In contrast, under the 1995 and current versions of the statute, the State need only prove that the individual knew or should have known that his or her actions, or failure to act, placed an older person under their care in a position where the older person could be subjected to harm. Both versions also require that the accused's actions result in harm to the older person.

The jury instructions did not distinguish between the two versions of the statute and were based on language contained in the 1995 version of the statute. Accordingly, we conclude that the jury was improperly instructed regarding neglect on Count I. We therefore reverse that conviction and remand for a new trial on Count I. We further conclude that the jury instructions properly informed the jury of the elements of the offenses alleged in Counts II and III. We therefore affirm Vallery's convictions on those counts.

---

[1] The incidents resulting in the deaths charged in Counts II and III occurred in 1996 and 1997, before the effective date of any legislative changes to NRS 200.5099 in the 1997 legislative session. Therefore, the 1995 version of the statute applies to these two counts. While minor amendments were made to the statutes involving abuse or neglect of the elderly between 1995 and 2001, they did not affect the language of the statutes relevant to this appeal. Therefore, the subsequent amendments would not change the result in this case.

## FACTS

At the time of the incidents in question, Vallery was the president and sole shareholder of Dee's Sleepy Hollow, Inc. The corporation operated residential group care facilities in Washoe County. Sleepy Hollow was licensed to operate the facilities by the Nevada State Health Division. Division representatives testified that, as part of the license, Sleepy Hollow was required to designate an individual as the administrator of the facilities. Vallery was the designated administrator for the Sleepy Hollow facilities. Pursuant to health division regulations, Vallery was responsible for insuring that the facilities adhered to all relevant codes and regulations governing such facilities.

Sleepy Hollow required the guardians or responsible persons for all residents to sign a "group care agreement" that included the following recital: "The home limits admissions to persons who are ambulatory and only require the furnishing of food, shelter, assistance and limited supervision."

This case involves individuals who resided in two of Sleepy Hollow's facilities, which are residential style houses located on Koenig and Panther Streets in Reno, Nevada. The Koenig house was licensed only as a standard residential group care facility. The Panther house had a higher level of license. It was licensed as a twenty-four-hour supervision facility. Both facilities were required to have live-in caregivers for the residents, but in the Panther house, at least one caregiver had to be awake and on duty at all times. In addition, alarms were required in the Panther house so that residents could not leave the house without the knowledge of the caregivers.

The resident caregivers in the Koenig house were Louise Edwards, Vallery's sister-in-law, and Addie Clarence Coleman, a man who had been raised by the same family as Vallery. The resident caregivers at the Panther home were Lucas Mack, Vallery's husband, and Vallery herself.[2]

Vallery was charged with violations of NRS 200.5099, Nevada's elder abuse and neglect prevention statute, as a result of the harm suffered by three individuals: Howard Thomas, Daniel Barreto and Duffy Sullivan.

### Count I—Howard Thomas

Thomas, age eighty, suffered from senile dementia and Alzheimer's disease when he became a resident of the Koenig house. At some point in March 1995, Thomas and his roommate were not staying in their beds and sleeping at night. Instead, they

---

[2]The State investigated and sought to charge Edwards, Coleman, and Mack with violations of the elder abuse statutes. However, at the time of Vallery's trial, the State was not pursuing those charges.

would get up, ransack their room, and eventually fall asleep on the floor. As a result of sleeping on the floor, Thomas developed a pressure sore on his hip. The record reflects that such sores are common in older persons.

The sore first appeared as a red mark in early April. By April 11, the sore was an open wound that required medical attention. Thomas' relatives were not advised of his condition until April 21, nor did any representative of Sleepy Hollow seek medical attention for Thomas' condition.

Conflicting testimony was presented as to Vallery's knowledge of Thomas' condition. Vallery testified that she only found out about the serious nature of the sore on April 24, and she informed Thomas' son that his father needed immediate medical attention. Vallery admitted that Edwards had told her that Thomas was sleeping on the floor and that he had ''bruises'' but denied that Edwards ever expressed concern for Thomas' condition. Edwards testified that she notified Vallery more than once of Thomas' progressive condition because only Vallery was authorized to contact Thomas' son or seek medical attention for Thomas.

In addition, on the audio track of a videotape of Thomas' condition filmed on April 11, Coleman notes that one of the purposes of the tape was to document Thomas' condition due to concerns that Vallery had not responded to Edwards' requests. Edwards was present when the remark was made and did not contradict Coleman. There was also conflicting testimony regarding whether Vallery viewed the videotape prior to Thomas' removal from the Koenig home.

The State presented medical testimony indicating that when hospitalized on April 24, Thomas had a large infected decubitus ulcer with cellulitis on his right hip. The medical testimony also indicated that the ulcer created a substantial risk of death based on the possibility of blood infection, *i.e.,* sepsis, and was a painful condition. The record reflects that the ulcer took three to six months to heal completely and caused permanent scarring. Vallery's medical experts testified that the ulcer was not infected or life-threatening but conceded that the ulcer, as depicted in the April 11 videotape, required medical attention.

## Count II—Daniel Barreto

Barreto, age eighty-four, suffered from Alzheimer's disease and required twenty-four-hour supervision prior to his admission to the Sleepy Hollow Panther residence. On December 21, 1996, Barreto left the residence without the knowledge of Vallery or Mack, both of whom were present in the house. It was snowing. Vallery discovered that Barreto was missing and began searching for him. Testimony indicated that about fifteen or twenty minutes passed between the time Barreto was last seen and the time that

Vallery noticed that Barreto "wasn't where she could see him." Caregivers spent five to ten minutes looking for Barreto in the house before they proceeded to search outside the house. Barreto was found covered in snow fifty to sixty feet outside the house under a tree.

Paramedics called to the scene were unable to ascertain any life signs in Barreto and instituted resuscitative measures, which were unsuccessful. Because of the chilled condition of Barreto's body, he was transported to a hospital as hypothermia cases may still respond if given more extensive resuscitative efforts at a medical facility. At the hospital, his core temperature was measured at seventy-nine degrees. Medical personnel advised Barreto's family that there was little chance he could be successfully revived because of the length of time he had been non-responsive and his temperature. In addition, the family was informed that if he were revived he would have significant impairments. Barreto's family declined to authorize extraordinary procedures, and Barreto was officially pronounced dead. An autopsy report and medical testimony indicated the cause of death to be organ failure due to extreme hypothermia.

Experts gave conflicting testimony regarding how long Barreto must have been outside to obtain a body temperature of seventy-nine degrees. The periods ranged from twenty minutes up to one hour.

Evidence was admitted that at least one other resident had left the Panther house without a caregiver's knowledge. In addition, Barreto had eloped from the Sleepy Hollow facilities, including the Panther house, three times prior to December 21, 1996.

Finally, evidence was admitted regarding the functioning of the door alarms. The exit doors at the Panther residence were equipped with alarms to prevent a resident from leaving the house without a caregiver's knowledge. Vallery and Mack testified that they did not hear the alarm. However, they did not assert that the alarms were malfunctioning, and an expert testified that there was nothing wrong with the alarms. The testimony raised three possible explanations for the failure of the alarms to alert Vallery and Mack to Barreto's elopement: (1) the alarm was improperly set on a soft chime mode that could not be heard, (2) the batteries on the alarm were bad, and (3) Barreto or another resident had turned the alarm from the loud setting to the chime setting.

Vallery and Mack testified that they did not leave the alarm on the loud setting at all times because the loud alarm bothered the residents. Therefore, the alarms were only set on the loud mode at night. Mack testified that he had checked the alarms that night. There was no testimony that any resident had ever tampered with the alarms, though there was testimony that the residents had fiddled with other fixtures in the house.

*Count III—Duffy Sullivan*

Sullivan, age seventy-four, suffered from Alzheimer's disease and required twenty-four-hour supervision prior to his admission to the Panther facility. On June 21, 1997, Vallery bathed Sullivan. She removed him from the bathtub and left him sitting on the commode seat next to the bathtub while she went downstairs to the laundry room to rinse out his clothing and get him clean clothing. Vallery testified that while she was doing this she heard water running upstairs. Vallery ran up the stairs and found Sullivan seated in the bathtub with his legs on each side of the bathtub. Vallery removed him from the bathtub and noticed that his buttocks were red. She put Sullivan in a hospital gown and took him to the hospital.

Sullivan was diagnosed with second-degree scald burns on his lower extremities. The admitting physician testified that he was of the opinion that Sullivan was not properly supervised, based upon his needs as an Alzheimer's patient, and the severity of the wounds he sustained. The doctor indicated that people with advanced Alzheimer's cannot be left alone around potentially dangerous conditions. Vallery was aware, from a prior scalding incident in the same tub, that it was possible for residents to burn themselves, depending on how long they were immersed in the hot water. Vallery testified that she thought it was safe to leave Sullivan for a few minutes because he hated the tub and she never thought he would get into it voluntarily.

Sullivan's family was informed that his mortality rate was 50 percent or greater, and that if he were to have a chance at life, he would have to be transferred to a Las Vegas burn unit for extensive, extremely painful treatment. Sullivan's wife declined to authorize the measures. Sullivan died seven days following the burn incident. An autopsy, which was performed on June 28, 1997, stated that Sullivan died from multiple organ failure as a result of burn wounds to the back, buttocks and thighs.

*Relevant procedural history*

Vallery was charged, by indictment, with three counts of violating NRS 200.5099. Count I involved the 1993 version of the statute and alleged that Vallery willfully caused or permitted Thomas to suffer unjustifiable physical pain and/or mental suffering as a result of abuse, neglect or exploitation. Count I also alleged that Thomas had suffered substantial bodily harm.[3]

---

[3]NRS 200.5099 (1993) provided, in pertinent part:

 2. Any adult person who willfully causes or permits an older person to suffer unjustifiable physical pain or mental suffering as a result of abuse, neglect or exploitation, or who willfully causes or permits an older person to be placed in a situation where the person may suffer

Counts II and III were filed under the 1995 version of NRS 200.5099 and alleged that Vallery had neglected Barreto and Sullivan, causing them to suffer physical pain resulting in death.[4]

An eight-day trial began on May 1, 2000. At the close of the State's case-in-chief, Vallery moved to dismiss the allegations in Count I. The motion was denied.

During the course of the trial, Vallery sought to admit the testimony of several witnesses whose proposed testimony related to Vallery's character for truthfulness as well as the level of care she rendered to relatives of the witnesses. Vallery argued that the proposed testimony was offered to counter inferences that she had not been truthful to investigating authorities and was not telling the truth about her knowledge of Thomas' condition. In addition, Vallery wished to argue that the evidence of good care given to the witnesses' relatives established that the incidents in question were unusual circumstances and unavoidable accidents. After hearing an offer of proof on each witness, the district court disallowed seven of Vallery's witnesses on the grounds that the proffered testimony was cumulative and repetitive.

The jury was instructed on language contained in the 1995

---

unjustifiable physical pain or mental suffering as the result of abuse, neglect or exploitation, is guilty of a gross misdemeanor unless a more severe penalty is prescribed by law for the act or omission which brings about the abuse, neglect, danger or loss through exploitation.

3. A person who violates any provision of subsection 2, if substantial bodily or mental harm results to the older person, shall be punished by imprisonment in the state prison for not less than 1 year nor more than 6 years.

1985 Nev. Stat., ch. 82, § 57, at 249.

[4]NRS 200.5099 (1995) provided, in pertinent part:

2. Except as otherwise provided in subsection 6, any person who abuses an older person, causing the older person to suffer unjustifiable physical pain or mental suffering, is guilty of a . . . felony . . . .

3. Except as otherwise provided in subsection 7, any person who has assumed responsibility, legally, voluntarily or pursuant to contract, to care for an older person and who:

(a) Neglects the older person, causing the older person to suffer physical pain or mental suffering;

(b) Permits or allows the older person to suffer unjustifiable physical pain or mental suffering; or

(c) Permits or allows the older person to be placed in a situation where the older person may suffer physical pain or mental suffering as the result of abuse or neglect,

is guilty of a gross misdemeanor unless a more severe penalty is prescribed by law for the act or omission which brings about the abuse or neglect.

. . . .

7. A person who violates any provision of subsection 3, if substantial bodily or mental harm or death results to the older person, shall be punished for a category B felony . . . .

1995 Nev. Stat., ch. 607, § 9, at 2253-54.

version of NRS 200.5099, as well as the 1995 statutory definitions of "abuse," "neglect," "permit," "exploitation" and "allow" applicable to NRS 200.5099. Following the trial, the jury returned guilty verdicts on all three counts against Vallery. The judgment of conviction indicates Vallery was found guilty under the neglect provisions of the statutes. Vallery was sentenced to concurrent prison terms totaling nine to twenty-nine years, with the terms suspended for a probationary period not to exceed five years.

## DISCUSSION

Vallery raises several contentions on appeal. We specifically address only three of them: (1) the district court's denial of the motion to dismiss portions of the Thomas allegations at the conclusion of the State's case as it relates to the interpretation of the 1993 and 1995 versions of NRS 200.5099, (2) the district court's decision to exclude the testimony of seven of Vallery's witnesses, and (3) the district court's refusal to give several of Vallery's proffered jury instructions.[5]

### I. *Motion to dismiss and statutory construction*

Vallery's motion to dismiss raised several issues. Among them was a contention that the State failed to introduce sufficient evidence in its case-in-chief to support allegations in Count I that she abused or exploited Thomas within the meaning of NRS 200.5099. Although Vallery did not specifically address the differences between the 1993 and 1995 versions of the statute, her arguments on the motion involve construction of the 1993 statute. Vallery asserts that the district court erred in refusing to grant her motion or accept her construction of the statute. The State contends that the merits of the motion are irrelevant because a district court has no authority to dismiss a criminal action at the close of evidence. We agree. We have previously concluded that a district court may not dismiss a criminal allegation after the close of the evidence, but instead is limited to giving an acquittal instruction or, after the jury returns a verdict of guilt, entering a judgment of acquittal or granting a new trial.[6]

While the district court did not err in refusing to grant the motion to dismiss, Vallery raised several issues in the motion and

---

[5]Vallery also asserts claims of error alleging: (1) insufficient notice of the grand jury proceedings, (2) a double jeopardy violation as a result of the imposition of civil sanctions, (3) the improper denial of a motion to sever the offenses, (4) prosecutorial misconduct, and (5) the improper admission of prior bad act evidence. We conclude that these contentions are without merit.

[6]*See generally State v. Purcell,* 110 Nev. 1389, 887 P.2d 276 (1994); NRS 175.381.

in her brief on appeal discussing the motion, regarding the construction of the elder abuse prevention statutes. Because statutory construction affected the jury instructions, we will address the substance of Vallery's statutory construction arguments. In addition, although Vallery was not convicted of abusing or exploiting an older person, only of neglecting an older person, we take this opportunity to address all three issues.

## A. "Abuse"

In the 1993 version of NRS 200.5099, the elements of the offense required that the State prove that an individual willfully caused or permitted an older person to suffer unjustifiable physical pain or mental suffering as a result of abuse or that the individual willfully caused or permitted an older person to be placed in a situation where the person may suffer unjustifiable physical pain or mental suffering as a result of abuse. In 1995, the Legislature eliminated the willfully caused or permitted language from the abuse provision of the statute and instead simply stated that "any person who abuses an older person, causing the older person to suffer unjustifiable physical pain or mental suffering," is guilty of violating the statute.[7]

The definition of "abuse," however, did not change. "Abuse," as used in any version of NRS 200.5099, is defined in NRS 200.5092:

> 1. "Abuse" means willful and unjustified:
> (a) Infliction of pain, injury or mental anguish on an older person; or
> (b) Deprivation of food, shelter, clothing or services which are necessary to maintain the physical or mental health of an older person.

The term "willful" is not defined. Vallery asserts that we should interpret that word and the phrase "willfully causes or permits" in the same way as we have interpreted the phrase "willfully caused" in the child abuse and neglect statutes. We agree. The language of the criminal child abuse and neglect statute[8] is very similar to the language used in the elderly abuse and neglect statute. In interpreting the child abuse and neglect statute, we have stated that a willful act is one that is done intentionally, not accidentally.[9] Moreover, we conclude that the deletion of the words "willfully causes" from NRS 200.5099 during the 1995 legislative session does not change the basic definition of abuse. Under NRS 200.5092, abuse involves willful and unjustified infliction or

---

[7] 1995 Nev. Stat., ch. 607, § 9, at 2253.

[8] NRS 200.508.

[9] *Smith v. State*, 112 Nev. 1269, 1276, 927 P.2d 14, 18 (1996).

deprivation. The plain language of the statute reflects intentional acts.[10]

### B. "Exploitation"

The 1993 version of NRS 200.5099 speaks of exploitation causing physical pain or mental suffering while "exploitation" was defined under NRS 200.5092(2) as "wrongful use of an older person or his money or property to the advantage of another."[11] The 1995 version makes it clear that exploitation refers to actions involving the property or assets of an older person. Exploitation is now unlawful under separate provisions of NRS 200.5099[12] and is defined as

> any act taken by a person who has the trust and confidence of an older person or any use of the power of attorney or guardianship of an older person to obtain control, through deception, intimidation or undue influence, over the older person's money, assets or property with the intention of permanently depriving the older person of the ownership, use, benefit or possession of his money, assets or property. As used in this subsection, "undue influence" does not include the normal influence that one member of a family has over another.[13]

We conclude that the 1995 amendments merely clarify the Legislature's intent that exploitation refers to the assets or property of an older person. Whereas the 1993 statute requires that the exploitation result in physical pain or mental suffering, the 1995 statute contains no such provision and makes it a crime to exploit the property of the older person even when no pain or suffering is involved.

### C. "Neglect," "Permit" and "Allow"

As with abuse, the 1993 version of NRS 200.5099 made it a crime for an individual to willfully cause or permit an older person to suffer unjustifiable physical pain or mental suffering as a result of neglect. NRS 200.5092 defined neglect:

> 3. "Neglect" means the failure of:

---

[10]See *Kirkpatrick v. Dist. Ct.,* 118 Nev. 233, 249, 43 P.3d 998, 1010 (2002) (citing *McKay v. Bd. of Supervisors,* 102 Nev. 644, 648, 730 P.2d 438, 441 (1986) and *Charlie Brown Constr. Co. v. Boulder City,* 106 Nev. 497, 503, 797 P.2d 946, 949 (1990), *overruled on other grounds by Calloway v. City of Reno,* 116 Nev. 250, 993 P.2d 1259 (2000)).

[11]1983 Nev. Stat., ch. 505, § 1, at 1359.

[12]NRS 200.5099(3), (4).

[13]NRS 200.5092(2).

> (a) A person who has assumed legal responsibility or a contractual obligation for caring for an older person . . . to provide food, shelter, clothing or services which are necessary to maintain the physical or mental health of the older person.[14]

"Permit" was defined in the body of NRS 200.5099 itself:

> "Permit" means permission that a reasonable person would not grant and which amounts to a neglect of responsibility attending the care and custody of an older person.[15]

Vallery again asserts that the phrase "willfully causes or permits" contemplates intentional conduct. Vallery contends the statute requires that an individual must have actual knowledge that an older person is in a situation where he or she is likely to suffer unjustifiable pain or mental suffering in order to be convicted of violating the statute. The State argues that, when combined with the definitions of neglect and permit, the statute does not require actual knowledge, but also contemplates constructive knowledge. Thus, an individual who should have known that his or her actions, or failure to act, placed an older person under his or her care in a position where the older person might be subjected to unjustifiable physical pain or mental suffering can also be charged with neglect. We disagree.

The statutes, read as a whole, require either that an individual willfully fails to provide for an older person or grant permission for some action that places an older person in a situation where the older person will suffer harm. We agree with the State that under a neglect charge, an individual does not have to intend to harm an older person. However, one cannot willfully cause or permit unjustifiable physical pain or mental suffering by failing to provide appropriate care or services if one is unaware of the needs of the older person. The phrase "willfully causes or permits" contemplates actual knowledge of a situation which requires action (or a denial of permission) in order to prevent harm to an older person.

We reach a different result however when we consider the language of the 1995 version of NRS 200.5099. As noted above, in 1995 the Legislature deleted the "willfully causes or permits" language. In addition, the Legislature restructured the statute.

---

[14]1983 Nev. Stat., ch. 561, § 2, at 1653 (currently codified at NRS 200.5092(4)(a)).

[15]1985 Nev. Stat., ch. 82, § 57, at 249 (currently codified at NRS 200.5099(8)(b)).

Subsequent to the amendments, NRS 200.5099(2) now provides criminal sanctions for any person who

has assumed responsibility, legally, voluntarily or pursuant to contract, to care for an older person and who:

(a) Neglects the older person, causing the older person to suffer physical pain or mental suffering;

(b) Permits or allows the older person to suffer unjustifiable physical pain or mental suffering; or

(c) Permits or allows the older person to be placed in a situation where the older person may suffer physical pain or mental suffering as the result of abuse or neglect.

The definitions of "neglect" and "permit" remain the same. The Legislature also added a new definition encompassing the term "allow":

"Allow" means to take no action to prevent or stop the abuse or neglect of an older person if the person knows or has reason to know that the older person is being abused or neglected.[16]

The 1995 version of NRS 200.5099 again uses language identical or substantially similar to the child abuse and neglect prevention statutes. In interpreting those statutes, we have said that the "permit" and "allow" language must be read in conjunction and when so read

both definitions establish the same requirement: a person acts unreasonably and is therefore criminally liable if she knows or has reason to know of abuse or neglect yet permits or allows the child to be subject to it. This requirement of knowledge and reasonableness adequately defines the state of mind required for a finding of guilt and effectively precludes punishment for inadvertent or ignorant acts.[17]

We conclude that the same reasoning applies to the elder abuse prevention statute. With the deletion of the "willfully causes" language from the neglect provisions of the statute and the addition of the "allow" language, we conclude that a conviction under the "neglect," "permit" or "allow" sections of NRS 200.5099 only requires proof that an accused knew or had reason to know that an older person could suffer harm as a result of the accused's actions or failure to act. Our conclusion is further supported by an additional amendment to the statutory scheme in 1999. The Legislature added NRS 200.50925, which states in pertinent part:

---

[16]1995 Nev. Stat., ch. 607, § 9, at 2254 (currently codified at NRS 200.5099(8)(a)).

[17]*Smith,* 112 Nev. at 1277, 927 P.2d at 18.

For the purposes of NRS 200.5091 to 200.50995, inclusive, a person:

1. Has "reasonable cause to believe" if, in light of all the surrounding facts and circumstances which are known or which reasonably should be known to the person at the time, a reasonable person would believe, under those facts and circumstances, that an act, transaction, event, situation or condition exists, is occurring or has occurred.[18]

While the term "reasonable cause to believe" does not appear in the neglect, permit or allow provisions of the statute, the language of NRS 200.50925 incorporates the overall theme of the statutes. In cases involving activities that do not rise to abuse, a reasonable person standard should apply. Thus, when an individual who is responsible for the care of an older person has knowledge of facts and circumstances that would cause a reasonable person to believe an older person was in a situation that might require additional care or services, the failure to take steps to check out the situation may result in criminal liability if the actions or failure to act causes the older person to suffer harm. Actual knowledge of danger to an older person is not required under the 1995 version of NRS 200.5099.

## II. Witness exclusion

Vallery asserts that the district court erred in disallowing testimony of several proffered witnesses. Most of the witnesses would have been called to testify generally that their relatives currently or previously resided in a Sleepy Hollow facility and that those relatives were properly cared for, or that the facilities were clean, neat, well run and of good quality. The witnesses would also have testified to their opinion that Vallery was a truthful woman, or to her reputation for truthfulness. The district court excluded the witnesses on the grounds that the proffered testimony was cumulative and repetitive. Vallery asserts that this amounted to a denial of her fundamental constitutional right to a fair trial, and that as such, she is entitled to a new trial pursuant to NRS 176.515(1). Vallery does not state how she was prejudiced by the district court's denial other than to say that the district court's decision was "manifestly wrong."

"A district court's decision to admit or exclude evidence rests within its sound discretion and will not be disturbed unless it is manifestly wrong."[19] Most of the proffered testimony was cumu-

---

[18]1999 Nev. Stat., ch. 631, § 1, at 3517.

[19]*Libby v. State,* 115 Nev. 45, 52, 975 P.2d 833, 837 (1999) (citing *Daly v. State,* 99 Nev. 564, 567, 665 P.2d 798, 801 (1983)).

lative. Although many of the excluded witnesses were recognized figures in the community, the district court did permit testimony from other similarly prominent community members. Moreover, the fact that these individuals were satisfied with the Sleepy Hollow facilities and Vallery is only marginally relevant to whether or not Vallery neglected to take appropriate action in the individual cases involving Thomas, Barreto and Sullivan. Finally, the State had advised both the district court and defense counsel that if the remaining witnesses were permitted to testify, it would seek to call rebuttal witnesses who would testify that they had removed relatives from Sleepy Hollow facilities due to improper care and supervision. The district court ruled that such rebuttal would be allowed and took that fact into consideration in making its decision to exclude the witnesses.

We conclude, with one exception, that the district court did not abuse its discretion in disallowing the witnesses' testimony. The exception involves the testimony of Shirley Keys. Keys would have testified that Alzheimer's patients are capable of turning off alarms. Not all of her testimony was not cumulative; however, we conclude that the exclusion of her testimony is harmless error.

## III. *Jury instructions*

Vallery contends that the district court erred in refusing to give several proposed jury instructions incorporating her defense theories. Generally, "the defense has the right to have the jury instructed on its theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may be."[20] Further, "[j]ury instructions should be clear and unambiguous."[21] The district court may, however, refuse a jury instruction on the defendant's theory of the case that is substantially covered by other instructions.[22] In addition, a district court must not instruct a jury on theories that misstate the applicable law.[23]

### A. *Instructions affecting all counts*

First, Vallery asserts that her responsibilities as the administrator of the facilities to adhere to administrative provisions and

[20]*Margetts v. State,* 107 Nev. 616, 619, 818 P.2d 392, 394 (1991); *see also Geary v. State,* 110 Nev. 261, 264-65, 871 P.2d 927, 929 (1994) (citing *Harris v. State,* 106 Nev. 667, 670, 799 P.2d 1104, 1105-06 (1990)).

[21]*Culverson v. State,* 106 Nev. 484, 488, 797 P.2d 238, 240 (1990).

[22]*Earl v. State,* 111 Nev. 1304, 1308, 904 P.2d 1029, 1031 (1995).

[23]*Ducksworth v. State,* 113 Nev. 780, 792, 942 P.2d 157, 165 (1997) (citing *Geary v. State,* 110 Nev. 261, 265, 871 P.2d 927, 929 (1994)).

statutes are limited by the contract provision requiring only "limited supervision" of the residents. Therefore, any violation of the administrative codes or statutes could not be the basis for a finding of negligence because Sleepy Hollow had only partially assumed responsibility to care for an older person, and Vallery had not personally assumed any duty of care.

Vallery proposed the following two instructions:

> A failure of Ms. Vallery to strictly adhere to a provision of the Nevada Administrative Code is not, of itself, a criminal act.
>
> In each of the charges in this case the State must prove beyond a reasonable doubt that Ms. Vallery assumed the responsibility to personally care for the older/elder persons. In this regard, you should consider any contracts which Ms. Vallery entered into for such care, and whether or not such contracts required that she personally provide such care.

Vallery contends that Sleepy Hollow's contractual provisions relieve her of her responsibilities under state regulations or statutes. We disagree.

An administrator charged with the supervision of a residential group care facility may not contractually limit his or her statutory or regulatory duties in order to avoid criminal liability. Vallery's contractual duties to Thomas, Barreto and Sullivan are separate from, not a replacement for, the duties imposed upon her as the administrator of the facility by statute or administrative regulation.

NRS 654.015 defines an administrator of a residential facility for groups as the "person who manages, supervises and is in general administrative charge of a residential facility for groups." Further, NRS 654.155(7) provides that each applicant for licensure as an administrator of a residential facility for groups must "[c]omply with such other standards and qualifications as the [Nevada state board of examiners] prescribes." Lastly, NRS 449.0355 states: "A residential facility for groups must not be operated except under the supervision of an administrator of a residential facility for groups licensed pursuant to the provisions of chapter 654 of NRS."

In the present case, there was no dispute that Vallery was the licensed administrator for the Sleepy Hollow residential group care facilities. She therefore had a duty to see that twenty-four-hour supervision was provided to residents in the Panther facility. Moreover, the health division regulatory code required that she notify a resident's physician upon the onset of illness or injury[24]

---

[24]NAC 449.2777(2) (repealed October 30, 1997). The NAC provisions pertaining to group residential care facilities were substantially revised in 1997. Some sections were recodified under different numbers and additional sec-

and that she provide protective supervision to avoid harm to the residents.[25] The regulations and statutes establish Vallery's duty of care, and a breach of the duty that causes an older person to suffer physical pain and/or mental suffering under the provisions of NRS 200.5099 may be the basis for criminal liability.

The statutes and regulations contemplate that an administrator can be held liable for harm to a resident even though the administrator did not assume personal care over an individual or was not the assigned caregiver. The jury was properly instructed on the law, and the district court did not err in refusing to give Vallery's instructions on this issue.

Next, Vallery contends that the district court erred when it refused to instruct the jury that "criminal negligence" is more than "ordinary negligence." Vallery asserts that she cannot be held criminally liable for a negligent act unless the State proves beyond a reasonable doubt that her actions were "aggravated, reckless or flagrant" and that she was "indifferen[t] to the consequences of those acts" and their affect on human life. According to Vallery, she cannot be convicted if her actions were only the result of inattention, mistaken judgment or misadventure. There must be some "evil intent." Vallery also contends that the standard is akin to "gross negligence." We disagree. Vallery's construction of NRS 200.5099 and the terms defined in NRS 200.5092 are inconsistent with the plain language of the statutes.

First, we note that both the 1993 and the 1995 versions of NRS 200.5099 refer to neglect, not negligence. The term "neglect" refers only to the failure to provide an older person with items necessary to maintain the physical or mental health of the older person. While the 1993 version of the statute does require that a person have actual knowledge that an older person is in need, there is no requirement under either version of the statute of ill will or recklessness towards the older person and we will not rewrite the statute to impose such a requirement.

Next, Vallery contends that the district court erred in refusing to give a set of proffered instructions defining proximate cause and criminal causation. The district court instructed the jury on the statutory language, which uses the words "causing" and "results" when referring to substantial bodily harm, death or suffering physical pain. We conclude these terms have plain and ordi-

---

tions were added on the duties and responsibilities of group care homes and administrators. *See* NAC 449.156-.2766. The changes in the regulations have no affect on our decision.

[25]NAC 449.2783(1)(a) (repealed October 30, 1997). This provision is now located at NAC 449.259(1)(a).

nary meanings that did not require additional clarification. Therefore, the district court did not err in refusing to give Vallery's instructions as the concept of causation was covered by other instructions.

Vallery also proffered instructions on intervening, superseding acts. Vallery asserts that such acts were the sole cause of the harm to Thomas and the deaths of Barreto and Sullivan. We have said that an "intervening cause means not a concurrent and contributing cause but a superseding cause which is itself the natural and logical cause of the harm."[26] An act can only be a superseding cause if it is unforeseeable.[27]

As to Thomas, Vallery contends that Coleman and Edwards were responsible for his care and that they were the sole cause of the failure to get him medical attention. The jury was instructed that Vallery had a right to rely on agents to perform the duties assigned to them. However, there was also testimony that Coleman and Edwards were instructed by Vallery, upon Thomas' admission, not to seek any medical help for Thomas without Vallery's express approval and that Edwards notified Vallery about Thomas' condition. There is no evidence that Vallery instructed Coleman or Edwards, as Vallery's agents, to seek medical attention for Thomas' condition. Given Vallery's position as the administrator of the facility and her admission that she did not investigate Thomas' condition when queried by Edwards, the facts do not support an instruction on intervening, superseding acts. The failure of Edwards and Coleman to take independent action to address Thomas' needs may be a concurring cause of his injuries, but it cannot be an intervening, superseding act.

With respect to Barreto, Vallery brought out through cross-examination, that it was possible, though not probable, that Barreto suffered a cardiac arrest before he succumbed to the cold and was buried under the snow. In addition, evidence was introduced that Barreto's relatives refused to allow extraordinary resuscitation measures to be implemented at the hospital.

As to the cardiac arrest theory, the record reflects no evidence that cardiac arrest alone, without the hypothermia, was the sole cause of Barreto's death. As to the failure to resuscitate, Barreto was already dead, and we decline to find that the decision of a family to refuse extraordinary resuscitation measures is an

---

[26]*Thomas v. Bokelman,* 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970) (citing *Segerman v. Jones,* 259 A.2d 794 (Md. Ct. App. 1969)).

[27]*Doud v. Las Vegas Hilton Corp.,* 109 Nev. 1096, 1105, 864 P.2d 796, 801 (1993).

unforseeable, superseding event. Therefore, an intervening, superseding instruction would have been improper as to Barreto.

Finally, as to Sullivan, the family was informed that Sullivan might have had a fifty percent chance of survival if he was transferred to a burn unit in Las Vegas and underwent extensive and extremely painful medical treatments. Assuming we were inclined to accept Vallery's argument that the family's decision was a "cause" of Sullivan's death, we conclude, as a matter of law, it would not be an unforeseeable act and again an intervening, superseding instruction was not warranted.

The jury was properly instructed on the elements of the offenses on the Barreto and Sullivan cases. Even if the jury believed that Vallery was not the caregiver assigned to either man, both men were under her supervision when they were injured, and the testimony supports a finding of neglect.

The testimony indicated that Barreto and Sullivan were in a twenty-four-hour supervision facility. Because of the advanced state of their Alzheimer's disease, they required more than "limited supervision." Sadly, due to their impaired mental conditions, extensive supervision was necessary to prevent them from injuring themselves.

Vallery knew Barreto was an elopement problem. She knew the chime setting on the alarm was insufficient to warn caregivers that a door had been opened without authorization and that residents could access and tamper with the settings. Despite this knowledge, she adopted a policy that allowed the alarms to be routinely set on chime and took no action to keep the residents away from the alarm settings or to install a different system.

Vallery also knew that Sullivan needed extensive supervision. She left him unsupervised in a setting potentially dangerous to him. She knew a resident could be scalded by hot bath water and that Alzheimer's patients act in unpredictable ways.

Based upon the record, we conclude that the district court did not err in refusing to give any of Vallery's proffered instructions on the Barreto and Sullivan counts.[28]

As to Thomas, the district court did not err in refusing to give the instructions addressed above. However, as noted below, we conclude that the jury was improperly instructed on the issues of abuse and neglect in the Thomas case.

---

[28]We again caution the district courts not to automatically instruct the jury on all portions of the statute. Whether a given subsection or statutory definition applies will depend on the nature of the charged offense and the facts of the individual case. There may also be cases where additional definitions of terms or causation are warranted, and nothing in this opinion is intended to indicate a formalistic approach.

B. *Instructions affecting Count I—Thomas*

Vallery raised additional challenges to the jury instructions relating only to the Thomas case. Vallery asserts that she could not be convicted of neglecting Thomas unless the State proved beyond a reasonable doubt that she had actual knowledge that Thomas had a specific problem that needed attention and that she failed to address the problem. Vallery objected to the instructions as they related to Count I and requested the following proposed instructions:

> Before Ms. Vallery may be convicted under Count I for any failure by her to more promptly obtain medical treatment for Mr. Thomas, the State must prove beyond a reasonable doubt that Ms. Vallery knew or should have known that Mr. Thomas' injuries were serious enough to require immediate medical attention, yet did nothing.
>
> . . . .
> ''Willfully'' as used in these instructions means an act or omission which is done intentionally, deliberately or designedly, as distinguished from an act or omission done accidentally, inadvertently or innocently. It means the conscious commission of a wrong.

Although the first proposed instruction speaks in terms of ''knew or should have known,'' Vallery's points and authorities below, and her briefs on appeal, reveal she intended to narrowly construe that language. Vallery contends that the language means that she observed Thomas' condition, or was actually told that Thomas had an open wound, and that she ''should have known'' from observation or the description that medical attention was necessary. Vallery argues that the ''willfully causes'' language of the statute requires the State to prove she either intentionally abused Thomas or had actual knowledge he needed medical attention and intentionally failed to seek help for his medical condition.

The State contends that the jury was properly instructed because the term ''willfully causes'' in a neglect case does not require intentional conduct or actual knowledge. Instead, the State argues it must only prove that an accused had knowledge of facts and circumstances that would lead a reasonable individual to conclude that an older person was at risk of suffering physical pain or mental suffering and that the accused took no action to prevent harm to the older person. The State apparently believed the same interpretation applied to both the 1993 and 1995 versions of NRS 200.5099.[29]

---

[29]Neither side specifically differentiated between the 1993 and 1995 ver-

The district court instructed the jury based upon the language contained in the 1995 version and did not separately instruct the jury on the Thomas case. In addition, the district court gave the following instruction on the term ''willfully.''

> The word ''willfully,'' when applied to the intent with which an act is done or omitted, as used in these instructions, implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require in its meaning any intent to violate the law, or injure another.

The State's argument and the jury instructions would be correct for a neglect charge under the 1995 version of the statute. However, the 1993 version of the statute applied to the Thomas case.

For an abuse case under any version of the statute, the State must prove intentional infliction of pain, injury or mental anguish or intentional deprivation of necessary items. It need not prove intent to violate the law or the actual injury that resulted. Thus, the definition of the term ''willfully'' was an incorrect statement of the law as to an abuse charge.[30]

With respect to the neglect allegations, because the jury was only given the 1995 statutory language, they were not properly instructed on the actual knowledge element of the offense present in the 1993 version of the statute. Because of the conflicting testimony concerning the extent of Vallery's knowledge of Thomas' condition and whether that knowledge would indicate to Vallery that Thomas needed medical treatment, as opposed to constructive knowledge that should have led her to take additional steps to verify his condition, we cannot say that the failure to properly instruct the jury was harmless beyond a reasonable doubt. We therefore conclude that the Thomas conviction must be reversed and remanded.

## CONCLUSION

We conclude that, under the 1993 and current versions of NRS 200.5099, the State must prove that the accused intentionally abused an older person. However, with respect to the offense charged under the neglect, permit or allow language of the 1995 and current versions of the statute, the State need only prove that

---

sions of the statute below although their arguments are clearly based upon the differing versions of the statute.

[30]We note that the last line of the proffered instruction is also confusing. It refers to ''conscious commission of a wrong,'' which could refer to knowledge that the conduct is unlawful, rather than an intent to cause pain. To that extent it would also be incorrect.

an accused knew or should have known that his or her actions, or failure to act, placed an older person under the accused's care in a position where the older person might be subjected to harm and harm actually resulted. We further conclude that a charge of neglect under the 1993 statute requires actual, not constructive knowledge, of the needs of an older person and a failure to provide for those needs.

We also conclude that the jury was properly instructed on the elements of the offenses on the Barreto and Sullivan counts and that Vallery's other contentions of error regarding those counts lack merit. As to the Thomas count, the jury instructions failed to properly advise the jury on the elements of abuse and neglect. Accordingly, we affirm the judgment of conviction on Counts II and III and reverse the conviction on Count I and remand Count I for further proceedings consistent with this opinion.