OPINION
 

 By the Court,
 

 Maupin, J.:
 

 In this opinion, we consider,
 
 inter alia,
 
 the admissibility of evidence gathered while a defendant is committed to a mental institution for purposes of evaluating and restoring competency to stand trial. For the reasons stated
 
 infra,
 
 we affirm all but five of the convictions entered below and remand for further proceedings.
 

 FACTS AND PROCEDURAL HISTORY
 

 Appellant Donald Estes sexually assaulted a minor, B.C., in a desert area near Las Vegas. The State charged Estes with six counts of sexual assault of a minor under the age of 14 years, two counts of lewdness with a child under the age of 14 years, two counts of battery with intent to commit a crime, two counts of coercion, two counts of preventing or dissuading a person from testifying or producing evidence, and one count of first-degree kidnapping. Based upon preliminary findings that Estes was not competent to stand trial, the district court twice committed him to the Lake’s Crossing Center for Mentally Disordered Offenders.
 
 [1]
 
 Relying upon evaluations provided by Lake’s Crossing staff, the district court eventually found Estes competent to stand trial.
 

 Estes pleaded not guilty by reason of insanity and the case proceeded to trial. He called no experts and testified as the sole defense witness. In this, he recounted all of his mental health problems beginning as a young adult and claimed that medication (lithium) prescribed for diagnosed bipolar disorder caused him to abduct and assault B.C. He further admitted much of the charged misconduct, stating that if “B.C. said he did it,” he probably did.
 

 In rebuttal, the State presented the testimony of three members of the Lake’s Crossing staff: Elizabeth Neighbors, Ph.D., a forensic psychologist and facility director; Hale Henson, M.D., psychiatrist; and A.J. Coronelía, a licensed clinical social worker. All three either observed or treated Estes during the evaluation process.
 

 Dr. Neighbors testified concerning psychological testing of Estes that revealed occasional malingering,
 
 i.e.,
 
 feigned mental illness. She also testified that neither she, nor members of Estes’ treatment team, observed him in a psychotic state or viewed him as incom
 
 *1130
 
 petent during his second commitment. Dr. Henson opined that Estes attempted to present a history of mental illness to avoid more severe prosecution, that Estes did not suffer from lithium poisoning, and that Estes desired to be medicated to support his claim that he had a disabling medical condition.
 

 Doctors Neighbors and Henson also testified to a reasonable degree of medical certainty that, under the
 
 M’Naghten
 
 standard,
 
 [2]
 
 Estes knew right from wrong and suffered from no mental condition that would impair his judgment during the alleged incidents with B.C. More particularly, Dr. Neighbors stated that Estes’ behavior as reported seemed deliberate and thoughtful. Both derived their opinions from police reports and statements to the police made by Estes and B.C.
 

 The social worker, A J. Coronelía, testified to Estes’ interest in preparing an insanity defense, as revealed in a discussion with him during her “legal process” class at Lake’s Crossing. She also recounted his comment to her, in an interview, that an affair between his wife and brother was the underlying reason for his divorce. The State elicited the latter statement in response to Estes’ testimony that he and his wife divorced because of his mental illness.
 

 The jury convicted Estes on all counts. The district court imposed a series of concurrent and consecutive sentences totaling 40 years imprisonment and ordered Estes to register as a sex offender upon his eventual release. The court further awarded Estes 898 days’ credit for time served in local custody before sentencing.
 

 On appeal, Estes assigns numerous trial errors, the most significant being the State’s use in rebuttal of testimony from Lake’s Crossing staff members who observed and interacted with Estes during his court-ordered commitments. He asserts additional claims of error in connection with the State’s portrayal of him as a liar during closing argument based upon the Lake’s Crossing evidence, the district court’s denial of his proffered involuntary intoxication instructions, use of an incorrect jury instruction concerning his insanity defense, admission of hearsay evidence and a photograph of B.C., admission of video testimony given by B.C.’s deceased father, admission of an audiotape and transcript of Estes’ voluntary statement to police, and the court’s failure to merge a count of battery with intent to commit a crime with one of the sexual assault counts. Finally, he asserts that the State failed to provide substantial evidence supporting the following charges:
 
 *1131
 
 dissuading a witness, battery with intent to commit a crime, and lewdness with a minor. Estes further claims that cumulative error requires reversal of all of the convictions.
 

 DISCUSSION
 

 Use of evidence from court-ordered commitments
 

 Estes claims that the State’s presentation of the three Lake’s Crossing witnesses requires reversal based upon due process, Fifth Amendment and public policy considerations; improper admission of opinion evidence regarding Estes’ sanity at the time of the incident; privilege; failure to properly qualify the experts; and failure to provide notice of psychiatric examinations to his counsel in violation of the Sixth Amendment. Estes also argues that use of confidential information generated from his commitments during the State’s closing argument constituted prejudicial error because it addressed the ultimate issue in the case. As a preliminary matter, we note that Estes failed to object on any of these grounds below; therefore, we will assess his claims under plain error review.
 
 [3]
 

 In resolving these claims, we must first clarify our jurisprudence concerning the use of such evidence as stated in
 
 Esquivel v. State,
 

 [4]
 

 McKenna v. State,
 

 [5]
 

 Brown
 
 v.
 
 State,
 

 [6]
 

 Winiarz v. State
 

 [7]
 

 and
 
 DePasquale v. State.
 

 [8]
 

 In
 
 Esquivel,
 
 we reversed a conviction based upon the State’s use of statements made during a court-ordered mental examination to impeach a defendant’s denial of the charges against him.
 
 [9]
 
 In this, we reasoned that a defendant who is subject to an examination by a court-appointed physician “should feel free in such a clinical climate to discuss all the facts relevant to the examination without the guarded fear that the statements may be later used against him.”
 
 [10]
 
 In
 
 McKenna,
 
 this court again determined that due process and fair play prohibit the use of the confidential content of a court-ordered psychiatric evaluation to secure a conviction.
 
 [11]
 
 We noted that the purpose of obtaining such an evaluation would be
 
 *1132
 
 defeated if the defendant knew that his statements could be used against him.
 
 [12]
 
 Going further, we embraced the federal court’s statement in
 
 Collins
 
 v.
 
 Auger
 

 [13]
 

 that
 

 it is fundamentally unfair to use [a] defendant’s incriminating admissions to a psychiatrist during a psychiatric examination as part of the prosecution’s case to establish his guilt. It is immaterial in this regard whether the court ordered examination was at the request of defendant or the prosecution or whether it was to determine his capacity to aid in his own defense or his mental condition at the time of the crime.
 
 [14]
 

 Applying
 
 Esquivel
 
 and
 
 Collins,
 
 we reversed McKenna’s conviction because the admission of his statements made during a court-ordered psychiatric examination constituted the heart of the prosecution’s case-in-chief.
 
 [15]
 
 Finally, in
 
 Brown,
 
 we held that use at a sentencing hearing of a defendant’s unwarned statements
 
 [16]
 
 in connection with a court-ordered examination, along with the use of the report based upon the statements, violated the Fifth Amendment.
 
 [17]
 

 In
 
 Winiarz,
 
 we reversed a first-degree murder conviction based upon testimony elicited from a court-appointed psychiatrist retained to assess the defendant’s “sanity” at the time of the alleged criminal misconduct and her competency to stand trial.
 
 [18]
 
 Although the defendant in
 
 Winiarz
 
 ultimately claimed that the homicide in question was accidental and never asserted that she lacked cognitive ability at any relevant time, defense counsel at trial inadvertently raised the question of her capability to premeditate when examining a defense expert. In rebuttal, the State called the psychiatrist who essentially testified that the defendant was a “coldblooded” murderer, describing her in such terms as “lying,” “faking” and “feigning,” and as possessing a histrionic and “dis-social” personality.
 
 [19]
 
 We held that “[s]uch a usurpation of the jury function” to assess credibility mandated reversal.
 
 [20]
 
 Although we cited
 
 Esquivel
 
 and
 
 McKenna
 
 in
 
 Winiarz,
 
 we did not reverse on
 
 *1133
 
 Fifth Amendment grounds. Rather, we concluded that the evaluator’s testimony severely transcended the boundaries of permissible expert testimony.
 
 [21]
 

 Of critical importance in
 
 Esquivel, McKenna
 
 and
 
 Winiarz
 
 is the common fact that none of the defendants in those matters placed their sanity at the time of the alleged criminal misconduct at issue. We did, however, address that situation by way of obiter dictum in
 
 DePasquale.
 
 In that case, we noted that use of a psychiatric examination for the limited purpose of rebutting an insanity defense does not implicate the Fifth Amendment.
 
 [22]
 
 In this, we relied upon
 
 Buchanan v. Kentucky,
 
 in which the United States Supreme Court permitted the State’s use of a psychiatric evaluation when the petitioner had requested the evaluation and relied upon portions of it to establish his defense of extreme emotional disturbance.
 
 [23]
 
 The Court emphasized that the evaluation only contained the psychiatrist’s general observations regarding the petitioner’s mental state, and concomitantly lacked a description of any statements by the petitioner as to the crimes charged.
 
 [24]
 
 From this, the Court concluded that the evaluation could be used for the limited purpose of rebutting the petitioner’s defense without violating the Fifth Amendment.
 
 [25]
 

 In short, when the defendant places his sanity or mental capacity at issue, a defendant’s right to protection under the Fifth and Fourteenth Amendments from the disclosure of confidential communications made during a court-ordered psychiatric evaluation relates only to the incriminating communications themselves. Thus, reading
 
 Esquivel, McKenna, Brown, Winiarz, DePasquale
 
 and
 
 Buchanan
 
 together, a defendant is generally entitled to protection from admission of un-Mirandized incriminating statements made to health care professionals in the context of a court-ordered evaluation or examination. But, if the defendant seeks to introduce the evaluation or portions of it in support of a defense implicating his
 
 *1134
 
 or her mental state, the prosecution may also rely upon the evaluation for the limited purpose of rebuttal.
 
 [26]
 

 We now turn to the evidence challenged within the framework of this appeal.
 

 Testimony by Ms. A.J. Coronelía
 

 Ms. Coronelía testified to statements made by Estes during a “legal process” class
 
 [27]
 
 she conducted at Lake’s Crossing, in which he discussed his interest in preparing an insanity defense. She also testified to another statement he made in the course of an interview, that the reason for his divorce was that his wife had an affair with his brother. We find no error in connection with any of this testimony. First, we conclude that the discussion concerning the preparation of an insanity defense was properly admitted to rebut his claims of ongoing mental illness. Nothing in his statements was incriminatory or the product of an interrogation,
 
 [28]
 
 and certainly, a statement is not “incriminatory” merely because it tends to show that the defendant is sane.
 
 [29]
 
 Second, his statements during the evaluation concerning the cause of his divorce, his brother’s affair with his wife, were admissible as to impeach his testimony at trial that his mental illness precipitated the end of his marriage. Again, none of this information was directly inculpatory or incriminating.
 
 [30]
 
 Rather, it related to the validity of Estes’ insanity defense.
 

 Estes also generally claims that Ms. Coronelía improperly testified as to his sanity based upon their interactions at Lake’s Cross
 
 *1135
 
 ing. We disagree. As stated, this testimony violates neither the Fifth nor the Fourteenth Amendments because Estes placed his sanity in issue and because the testimony does not describe any statements by Estes regarding the underlying crimes.
 

 Testimony by Dr. Neighbors and Dr. Henson
 

 Relying upon
 
 Esquivel
 
 and
 
 Winiarz,
 
 Estes similarly claims that the district court erred in allowing the testimony of Dr. Neighbors and Dr. Henson because they attacked Estes’ credibility. In this, he challenges Dr. Neighbors’ testimony that psychological testing indicated that Estes occasionally feigned mental illness, and that neither she, nor members of her treatment team, observed Estes in a psychotic state. With respect to Dr. Henson, Estes takes issue with his testimony opining that, based on medical records, Estes did not suffer from lithium poisoning and that Estes had attempted to present a history of mental illness to avoid prosecution. Estes also claims error with Dr. Henson’s testimony that Estes desired to be medicated to demonstrate that he had a disabling mental condition.
 
 [31]
 
 We disagree. In
 
 Esquivel
 
 and
 
 Winiarz,
 
 while we discerned error in the use of the defendant’s statements from a psychiatric interview to attack the defendant’s credibility, the defendants in those cases, as noted, did not place their sanity at issue. And, again, the ruling in
 
 Winiarz
 
 did not relate precisely to the Fifth Amendment, but to the permissible scope of expert opinion. Finally, the testimony given by Drs. Henson and Neighbors was within their stated areas of expertise and did not reveal their confidential communications other than by inference.
 
 [32]
 

 Estes also takes issue with Dr. Neighbors’ and Dr. Henson’s testimony that Estes knew right from wrong and suffered no mental condition that would impair his judgment during the incident. In this, Estes claims that they applied an incorrect standard for in
 
 *1136
 
 sanity in their testimony that requires reversal. In
 
 Finger v. State,
 
 we stressed that “[t]o qualify as being legally insane, a defendant must be in a delusional state such that he cannot know or understand the nature and capacity of his act, or his delusion must be such that he cannot appreciate the wrongfulness of his act.”
 
 [33]
 
 In short, “[t]he ability to understand right from wrong under
 
 M’Naghten
 
 is directly linked to the nature of the defendant’s delusional state.”
 
 [34]
 
 We conclude that any error in this connection was harmless beyond a reasonable doubt.
 
 [35]
 
 First, while these witnesses recited an incomplete standard for insanity in their testimony, the district court admonished jurors that it would advise them of the proper insanity standard. Second, Estes provided no competent evidence that lithium poisoning induced a delusional state under
 
 Finger.
 

 In summary, the testimony offered by Drs. Neighbors and Henson did not relay statements by Estes as to the crimes for which he was charged. As a general matter, their testimony primarily related to their general observations of his mental state, which is permissible under
 
 Buchanan
 
 to rebut an insanity defense. However, Neighbors also stated that Estes’ behavior during the underlying incident struck her as deliberate and thoughtful, which violates the rule in
 
 Winiarz
 
 prohibiting psychiatric testimony that a defendant had the mental state constituting an element of the crime charged.
 
 [36]
 
 Although we cannot conclude that this error warrants reversal, we caution the prosecution to refrain from introduction of such testimony in the future.
 
 [37]
 

 
 *1137
 

 Portrayal of Estes as a liar in closing argument
 

 Estes claims error with respect to several statements made by the State in its closing argument based upon the Lake’s Crossing evidence. We note as a preliminary matter that Estes failed to object to any of the disputed commentary below; therefore, we will review his contentions for plain error.
 

 The first comment with which Estes takes issue is the following:
 

 No ... it wasn’t ten years ago that he was setting this defense; it was four or five weeks after he got caught when he sat around and thought about it, and it was then that he began developing it.
 

 We discern no error in this argument because it legitimately questions the validity of Estes’ insanity defense.
 

 Estes takes further issue with the State’s argument that “[h]e lied because he knew the difference between right and wrong.” The State, however, made this statement within the context of its argument that
 

 [h]e remembers talking to Detective Kisner. He acknowledged that he lied to Detective Kisner because he was scared and confused at the time of his statement. ... He knew exactly what he was accused of, he knew exactly what he did, and he knew exactly what he was going to try to say to get out of it.
 

 As Estes admitted that he had lied to Detective Kisner, these arguments find sufficient basis in the record and do not constitute error.
 

 Estes also claims error with the following commentary:
 

 He prepared for his insanity defense. “You got to do what you got to do.”[
 
 38
 
 ]
 

 We all want to believe desperately that people have to be sick to do these horrific things to kids. Evil, prey, rotten, maybe,
 
 *1138
 
 and maybe by certain standards is sick, but he is not legally insane, and he must be held accountable for what he did to that child.
 

 We discern no error with this argument; it properly urges the jury to arrive at the result sought by the State.
 

 Involuntary intoxication instruction
 

 Estes claims that the district court violated his due process rights when it denied his request to issue jury instructions on involuntary intoxication. In this, the court found that Estes presented no competent evidence that he suffered from involuntarily induced lithium toxicity. Although a defendant in a criminal case is entitled to a jury instruction on his theory, no matter how weak or incredible it may be,
 
 [39]
 
 and district courts have a duty to correct an inaccurate or incomplete theory-of-defense instruction,
 
 [40]
 
 the instruction must be supported by some competent evidence in the record.
 
 [41]
 
 Because Estes offered no evidence other than his irrelevant lay opinion that he suffered from lithium toxicity,
 
 [42]
 
 and given that the only competent evidence on this issue, that given by Dr. Henson, was to the contrary, we discern no error in the court’s refusal of the involuntary intoxication theory. But even if the district court erred in refusing the proffered instructions, we further conclude that any error is harmless beyond a reasonable doubt given the overwhelming state of the evidence against Estes.
 
 [43]
 

 Jury instruction on insanity
 

 Estes asserts that the district court erred in giving an instruction on insanity that failed to specify that the jury was to consider his
 
 *1139
 
 mental state during the commission of the offenses, not before or after. The instruction given stated:
 

 To qualify as being legally insane, a defendant must be in a delusional state such that:
 

 (1) he cannot know or understand the nature and capacity of his act, or
 

 (2) his delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not authorized by law.
 

 Estes argues that this instruction is insufficient under
 
 Miller
 
 v.
 
 State,
 
 in which this court stated that if a defendant presents evidence of insanity during the time coinciding with the offense, the defendant is “entitled to a correct and complete instruction that insanity on a temporary basis can be a defense to the crime.”
 
 [44]
 

 We conclude that the lack of specification regarding the time period the jury was to consider in evaluating the insanity defense was not erroneous because the text of the instruction leaves the clear inference that the delusional state must exist at the time of the offense charged.
 

 Cumulative error
 

 Estes claims cumulative error merits reversal of all of the convictions entered against him.
 
 [45]
 
 Beyond the claims of error addressed above, he challenges on hearsay grounds the admission of B.C.’s medical records, police testimony as to B.C.’s statements, and Dr. Neighbors’ testimony regarding the opinions of other Lake’s Crossing doctors concerning Estes’ competency. On prejudice grounds, Estes takes issue with the introduction of the videotape of B.C.’s father’s preliminary hearing testimony and the duplicative admission of audiotaped and transcribed versions of Estes’ statement to police. On relevance grounds, Estes also claims error with showing the jury a photograph of B.C. taken at the preliminary hearing in justice court.
 

 Admission of B.C.’s medical records
 

 Estes claims that a portion of B.C.’s medical records constituted inadmissible hearsay. He relies upon the United States Supreme
 
 *1140
 
 Court decision in
 
 Crawford v.
 
 Washington,
 
 [46]
 
 and our recent decisions in
 
 City of Las Vegas v.
 
 Walsh
 
 [47]
 
 and
 
 Flores
 
 v.
 
 State,
 

 [48]
 

 for the proposition that records containing testimonial hearsay are inadmissible unless such statements are first redacted. Because B.C. testified at trial, we reject Estes’ claims of error under
 
 Crawford, Walsh
 
 and
 
 Flores
 
 on this issue.
 
 [49]
 

 Police testimony regarding B.C.’s statements
 

 Estes claims that the district court erred in allowing Officer Julie Hager to testify regarding B.C.’s hearsay statements to her because the State had not asked B.C. about them during his testimony. Estes apparently takes issue with B.C.’s statements that Estes told B.C. he was taking B.C. to his girlfriend’s residence; that Estes threatened to kill B.C.’s family if B.C. said anything; that Estes touched B.C. in his private area; and that Estes urinated in his mouth. Estes timely objected on hearsay grounds, and the prosecution responded that it offered this testimony to demonstrate the reason for arrest. After a sidebar conference, the district court overruled Estes’ objection. In essence, Estes claims that the admission of this hearsay violates
 
 Crawford
 
 and
 
 Flores.
 

 We reject Estes’ claims of error on this issue. As Estes obtained the police report during discovery, he had the opportunity to cross-examine B.C. on the report’s contents, including B.C.’s statements to Officer Hager regarding the assault.
 
 [50]
 
 That opportunity negates any problem under either
 
 Crawford
 
 or
 
 Flores.
 

 Dr. Neighbors ’ testimony as to the opinions of nontestifying doctors
 

 Estes takes issue with Dr. Neighbors’ testimony as to the opinions of other Lake’s Crossing doctors who did not testify and
 
 *1141
 
 voiced an opinion on behalf of all of them. In particular, Estes notes that Dr. Neighbors testified to the collective opinion of the other doctors that Estes was competent during his second commitment.
 

 We conclude that Dr. Neighbors’ testimony as to the opinions of other doctors was likely erroneous, in that such testimony constituted inadmissible hearsay.
 
 [51]
 
 NRS 50.285, however, allows experts to base their opinions on facts or data that are otherwise inadmissible, if such information is of a type reasonably relied upon by experts in that field. Thus, Dr. Neighbors’ reasonable reliance upon the opinions of her colleagues in forming her own diagnosis was marginally appropriate.
 

 Photograph of B.C.
 

 Estes asserts that the State’s introduction of a photograph of B.C. taken at the preliminary hearing was irrelevant
 
 [52]
 
 and that its probative value was substantially outweighed by its unfair prejudicial effect.
 
 [53]
 
 While the probative value of the evidence seems marginal and is unrelated to the elements of any of the charges, the introduction was harmless beyond a reasonable doubt, given the overwhelming evidence presented by the State against Estes.
 

 Video of preliminary hearing testimony
 

 Estes argues that introduction of a video depicting the father’s preliminary hearing testimony was irrelevant and overly prejudicial. More particularly, Estes claims that the State introduced the video to evoke the jury’s sympathies towards a distraught father who is now deceased. Estes alternatively asserts that the State could have read portions of the preliminary hearing transcript, rather than permitting the jury to view the tape.
 

 We conclude that any potential prejudice stemming from the introduction of this evidence failed to outweigh the probative value of this testimony. The testimony was relevant to the kidnapping
 
 *1142
 
 charge because it demonstrated the scope of B.C.’s father’s consent regarding Estes’ transportation of B.C. Due to the relevance of this testimony and the discretion accorded to district court decisions on issues of admissibility,
 
 [54]
 
 the State was not restricted to the mere introduction of portions of the preliminary hearing transcript, as opposed to the videotape.
 
 [55]
 

 Audiotape and transcript of Estes’ statement to police
 

 Estes asserts that admission of both an audiotape and the written transcript of his statement to police concerning the events in question placed undue emphasis on his pretrial admissions. He further claims that the district court failed to assess the prejudicial effect of permitting the jury to take certain items of evidence into the deliberation room with them.
 

 We reject these separate contentions. Given the body of evidence introduced against Estes, there is no indication that the duplicative introduction of his police statements compels reversal. Further, NRS 175.441(1) provides that the jury, upon retiring for deliberation, may take with them all items introduced into evidence, “except depositions or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession.” Given the district court’s broad discretion on issues of admissibility,
 
 [56]
 
 we discern no error in either regard.
 

 In light of the above, we conclude that cumulative error did not adversely affect the fairness of the trial on the totality of charges. The claimed errors listed as additional and cumulative were relatively minor and, as stated above, overwhelming evidence inculpated Estes in the crimes alleged.
 

 Errors claimed with respect to individual charges
 

 Merger
 

 Estes claims that count three, battery with intent to commit a crime (sexual assault) based on Estes’ pulling of B.C.’s hair, merges with the sexual assault count premised on oral copulation. In support of this argument, Estes asserts the following: (1) B.C.’s testimony regarding the hair pulling during oral copulation goes to the “lack of consent” element of the sexual assault charge, and
 
 *1143
 
 (2) the State is constitutionally prohibited from charging a person for the same crime twice. Estes also argues that the elements necessary to prove battery are contained within the elements necessary to prove sexual assault, and therefore battery is a lesser-included offense of sexual assault.
 

 NRS 200.400(1) provides that “ ‘battery’ means any willful and unlawful use of force or violence upon the person of another.”
 

 NRS 200.366(1) defines sexual assault in the following manner:
 

 A person who subjects another person to sexual penetration . . . against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.
 

 Nevada utilizes the
 
 Blockburger
 
 test to determine whether separate offenses exist for double jeopardy purposes.
 
 [57]
 
 Under this test, two offenses are separate if each offense requires proof of a fact that the other does not.
 
 [58]
 
 Under Blockburger, it is impermissible for a defendant to suffer conviction for both greater- and lesser-included offenses.
 
 [59]
 
 To determine the existence of a lesser-included offense, this court looks to “whether the offense in question ‘cannot be committed without committing the lesser offense.’ ”
 
 [60]
 

 We discern no error in maintaining the separate charges of sexual assault and battery with intent to commit a crime. Battery requires physical force or violence. Sexual assault does not require physical force or violence as an element.
 
 [61]
 
 Additionally, the two charges in this case were directed at different acts. Therefore, under these circumstances, no merger of charges was necessary.
 

 Substantial evidence
 

 Estes claims that the State failed to prove beyond a reasonable doubt the following: (1) two counts of dissuading a witness, (2) one count of battery with intent to commit a crime, and (3) two counts of lewdness with a minor.
 

 
 *1144
 
 “In reviewing evidence supporting a jury’s verdict, this court must determine whether the jury, acting reasonably, could have been convinced beyond a reasonable doubt of the defendant’s guilt by the competent evidence.”
 
 [62]
 
 After viewing the evidence in the light most favorable to the prosecution, this court considers whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 [63]
 
 Where there is conflicting testimony, the jury determines its weight and credibility.
 
 [64]
 

 Two counts of dissuading a witness
 

 The State premised the first dissuading count upon the allegation that Estes threatened to kill B.C.’s mother and father if B.C. reported the incidents. It premised the second dissuading count upon Estes’ offer of money to B.C. to not report him. The criminal information below based these charges upon NRS 199.230, which provides in pertinent part:
 

 A person who, by persuasion, force, threat, intimidation, deception or otherwise, and with the intent to obstruct the course of justice, prevents or attempts to prevent another person from appearing before any court, or person authorized to subpoena witnesses, as a witness in any action, investigation or other official proceeding, or causes or induces another person to absent himself from such a proceeding or evade the process which requires him to appear as a witness to testify or produce a record, document or other object, shall be punished ....
 

 Estes claims that because B.C. was not under subpoena to testify or yet a potential witness at the time of the alleged threats, the State failed to meet its burden on these counts. Estes further claims that it was error to utilize a jury instruction in support of the dissuading charge based on NRS 199.305,
 
 [65]
 
 rather than NRS 199.230, because NRS 199.305 was not relied upon in the original charging document. The jury instruction premised on NRS 199.305 provided as follows:
 

 
 *1145
 
 Every person, who by intimidating, threatening, dissuading prevents or attempts to prevent a victim or witness from reporting a crime or commencing prosecution, is guilty of preventing or dissuading witness or victim from reporting crime or commencing prosecution.
 

 We agree with Estes’ contentions on this issue. In short, the State ultimately proffered a jury instruction on this issue based on a statute other than that utilized in the charging document.
 

 Battery with intent to commit a crime
 

 Estes claims that the State failed to prove count four, battery with intent to commit sexual assault by grabbing B.C.’s throat. Estes notes that B.C. did not testify that Estes grabbed his throat. The State concedes that B.C. did not testify as to this particular act. We therefore reverse the conviction as to this count.
 

 Lewdness with a minor
 

 Estes claims that the State failed to prove counts 12 and 13 alleging lewdness with a minor. The basis for count 12 was rubbing B.C.’s genital area, and the basis for count 13 was rubbing B.C.’s buttocks. Estes claims that B.C. never specifically testified that Estes rubbed these particular areas and points to his own testimony denying these acts occurred. We agree that the evidence failed to establish these charges and therefore reverse the convictions as to these counts.
 

 CONCLUSION
 

 When the prosecution seeks to use a court-ordered psychiatric evaluation to rebut an insanity defense, the prosecution may not utilize the portions of the evaluation containing the defendant’s
 
 *1146
 
 statements that directly relate to culpability for the crimes charged, unless the defendant was first informed of his Fifth Amendment rights and has agreed to waive them. However, the prosecution may use other portions of the evaluation to rebut an insanity defense. In line with the above, we conclude that the prosecution did not violate Estes’ rights in its use of information from Estes’ court-ordered commitment.
 

 Despite our determinations of error regarding Dr. Neighbors’ testimony addressing the impressions of two nontestifying doctors and the admission of B.C.’s photograph, we conclude that the overwhelming evidence against Estes militates against reversal. However, we remand for dismissal of count 4, battery with intent to commit sexual assault, count 12, lewdness with a minor, and count 13, lewdness with a minor, and for vacation of the attendant sentences. We also remand this case for further proceedings on the two dissuading of a witness counts and to have the judgment of conviction reflect that Estes was convicted pursuant to a jury trial and not a guilty plea,
 
 [66]
 
 and to correct the number of days’ credit for time served, if necessary.
 
 [67]
 

 Rose, C. J., Becker, Gibbons, Douglas, Hardesty and Parraguirre, JJ., concur.
 

 [1]
 

 Lake’s Crossing is operated by the Nevada Division of Mental Health and Development Services.
 

 [2]
 

 The seminal common-law case from England articulating standards for insanity as a defense to criminal misconduct is
 
 M’Naghten's Case,
 
 8 Eng. Rep. 718, 10 Cl. & Fin. 200, 209 (1843).
 
 See Finger v. State, 111
 
 Nev. 548, 27 P.3d 66 (2001) (generally adopting the
 
 M’Naghten
 
 construct for when an accused may successfully assert an insanity defense).
 

 [3]
 

 See Green
 
 v.
 
 State,
 
 119 Nev. 542, 545, 80 P.3d 93, 95 (2003) (under plain error review, this court examines whether an “error” occurred, whether it was “plain” or clear, and whether it affected the defendant’s substantial rights).
 

 [4]
 

 96 Nev. 777, 617 P.2d 587 (1980).
 

 [5]
 

 98 Nev. 38, 639 P.2d 557 (1982).
 

 [6]
 

 113 Nev. 275, 287-90, 934 P.2d 235, 243-45 (1997).
 

 [7]
 

 104 Nev. 43, 752 P.2d 761 (1988).
 

 [8]
 

 106 Nev. 843, 803 P.2d 218 (1990).
 

 [9]
 

 96 Nev. at 778, 617 P.2d at 587.
 

 [10]
 

 Id.
 

 [11]
 

 98 Nev. at 39, 639 P.2d at 558.
 

 [12]
 

 Id.
 

 [13]
 

 428 F. Supp. 1079 (S.D. Iowa 1977).
 

 [14]
 

 Id.
 
 at 1082;
 
 see also Estelle
 
 v.
 
 Smith,
 
 451 U.S. 454 (1981).
 

 [15]
 

 McKenna,
 
 98 Nev. at 40, 639 P.2d at 558-59.
 

 [16]
 

 See Miranda v. Arizona,
 
 384 U.S. 436 (1966).
 

 [17]
 

 113 Nev. at 289-90 , 934 P.2d at 244. In this, we relied upon
 
 Estelle
 
 v.
 
 Smith,
 
 which prohibits the use of such evidence at the penalty phase of a murder trial where no competent waiver of Fifth Amendment rights was effected. 451 U.S. at 468-69.
 

 [18]
 

 104 Nev. 43, 752 P.2d 761.
 

 [19]
 

 Id.
 
 at 49, 752 P.2d at 765.
 

 [20]
 

 Id.
 
 at 51, 752 P.2d at 766.
 

 [21]
 

 Id.
 

 [22]
 

 106 Nev. 843, 847, 803 P.2d 218, 220 (1990). The statements admitted in
 
 DePasquale
 
 were spontaneously made at a mental health facility to a detention center guard between examinations. The health care professionals were not present. Under the circumstances presented, we concluded that the statements were not the product of an interrogation for Fifth Amendment purposes. Also, the statements did not relate to the charges, but to how the defendant felt he had to handle his interaction with evaluators.
 
 DePasquale,
 
 106 Nev. at 846-47, 803 P.2d at 220.
 

 [23]
 

 483 U.S. 402, 423 (1987).
 

 [24]
 

 Id.
 

 [25]
 

 Id.
 
 at 423-24.
 

 [26]
 

 Interviews during psychiatric evaluations are custodial and statements made by the defendant are entitled to Fifth Amendment protection. This is acknowledged in
 
 Estelle v.
 
 Smith, 451 U.S. 454 (1981), where the Court found such a violation in the absence of a free, voluntary and competent waiver of the rights against self-incrimination per
 
 Miranda.
 
 This notwithstanding, it would be counter to the purpose of these examinations to either encourage or mandate the administration of
 
 Miranda
 
 warnings by health care personnel. Thus, the right to the protection applies if
 
 Miranda
 
 warnings are not given. But, when the defendant relies upon the examination in aid of an insanity defense, other evidence concerning the evaluation becomes relevant and admissible. This notion is confirmed via obiter dictum in
 
 Estelle. Id.
 
 at 465.
 

 [27]
 

 Estes correctly describes Lake’s Crossing as a facility whose goal is to assist accused persons to gain legal competency so that prosecutions against them may go forward. The legal process classes referred to by Ms. Coronelía are designed to prepare these defendants to be able to assist counsel at trial.
 

 [28]
 

 See DePasquale,
 
 106 Nev. at 847, 803 P.2d at 220.
 

 [29]
 

 See Haynes
 
 v. State, 103 Nev. 309, 318, 739 P.2d 497, 503 (1987).
 

 [30]
 

 It seems inconsistent that un-Mirandized custodial statements to the police may be used to impeach the declarant and un-Mirandized statements to mental health professionals in the context of a court-ordered examination may not
 
 *1135
 
 be so used under
 
 Esquivel.
 
 However, differing considerations compel this result,
 
 i.e.,
 
 the need for free and unguarded communication between the patient and physician.
 

 [31]
 

 Estes further claims that the State improperly introduced testimony by Drs. Neighbors and Henson in drawing a connection between Estes’ use— and disuse — of medication and his feigning of mental illness. In this, he relies upon
 
 Sell v. United States,
 
 539 U.S. 166, 178-81 (2003), in which the United States Supreme Court held that a defendant has a right to refuse medication. We reject this attenuated contention because the State may use such evidence to rebut Estes’ defense of insanity.
 
 See Buchanan,
 
 483 U.S. at 423.
 

 [32]
 

 See
 
 NRS 50.275. Estes claims that Ms. Coronelía, Dr. Neighbors, and Dr. Henson violated his privileges against the disclosure of confidential information generated as a result of the court-ordered doctor-patient and psychologist-patient relationship. We disagree.
 
 See
 
 NRS 49.245; NRS 49.235(2).
 

 [33]
 

 117 Nev. 548, 576, 27 P.3d 66, 85 (2001).
 

 [34]
 

 Id. at 577, 27 P.3d at 85.
 

 [35]
 

 See Chapman
 
 v. California, 386 U.S. 18, 24 (1967).
 

 [36]
 

 104 Nev. at 51, 752 P.2d at 766. The rule in
 
 Winiarz
 
 was based upon an embrace of Federal Rule of Evidence 704(b), which prohibits expert witnesses from stating an “opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto.” This rule has been criticized as creating inappropriate tension with the rules of evidence allowing the admission of expert testimony on ultimate issues to be decided by the finder of fact.
 
 See
 
 David Cohen, Note,
 
 Punishing the Insane: Restriction of Expert Psychiatric Testimony by Federal Rule of Evidence 704(b),
 
 40 U. Fla. L. Rev. 541, 548 (1988) (examining inconsistent applications of Rule 704(b)); Anne Lawson Braswell, Note,
 
 Resurrection of the Ultimate Issue Rule: Federal Rule of Evidence 704(b) and the Insanity Defense,
 
 72 Cornell L. Rev. 620, 627 (1987) (questioning the purposes of Rule 704(b));
 
 cf.
 
 NRS 50.295 (permitting expert testimony on ultimate issues).
 

 [37]
 

 We have considered and rejected Estes’ claims that the State failed to provide notice of its rebuttal experts, that the State failed to properly qualify Dr. Neighbors as an expert, and that lack of notice to counsel of the psychi
 
 *1137
 
 atric interviews violated his Sixth Amendment right to counsel. Counsel was fully aware of the commitment and the responsibilities of the staff at Lake’s Crossing.
 

 [38]
 

 The prosecutor likely derived this quote from Ms. Coronella’s testimony regarding Estes’ comments to her in relation to preparation of his insanity defense.
 

 [39]
 

 Gallery
 
 v.
 
 State,
 
 118 Nev. 357, 372, 46 P.3d 66, 76-77 (2002).
 

 [40]
 

 Carter v. State,
 
 121 Nev. 759, 765, 121 P.3d 592, 597-98 (2005).
 

 [41]
 

 See Wickliffe v. Sunrise Hospital,
 
 104 Nev. 777, 782, 766 P.2d 1322, 1325-26 (1988) (noting that each party is “ ‘entitled to have the jury instructed on all of his theories of the case that are
 
 supported by the pleadings and the evidence’
 
 ” (emphasis added) (quoting
 
 Rocky Mt. Produce v. Johnson,
 
 78 Nev. 44, 52, 369 P.2d 198, 202 (1962))).
 

 [42]
 

 See
 
 NRS 50.265.
 

 [43]
 

 See Chapman
 
 v.
 
 California,
 
 386 U.S. 18, 24 (1967). Thomas Wahl analyzed DNA evidence collected from several items connected to the incident. Wahl’s analysis revealed that the mouthpiece of a mouthwash bottle contained Estes’ sperm and DNA attributable to B.C. Wahl also tested DNA evidence from Estes’ boxer shorts and penis, both of which contained Estes’ sperm and typing data consistent with a mixture of DNA from Estes and B.C. Wahl’s analysis of B.C.’s sweatshirt sleeve indicated a mixture of DNA consistent with Estes’ and B.C.’s DNA types, as well as the presence of Estes’ sperm. From this testimony, we conclude that the DNA evidence implicating Estes in the sexual assault was overwhelming.
 

 [44]
 

 112
 
 Nev. 168, 174, 911 P.2d 1183, 1187 (1996). We note that Estes has mischaracterized the instruction given in
 
 Miller
 
 as having failed to explain that the relevant time period or duration for a temporary delusional state was during the commission of the alleged crime. The
 
 M’Naghten
 
 instruction in
 
 Miller
 
 properly did so, but the court’s other erroneous statements that there was no such thing as a “temporary insanity” defense, along with similar erroneous statements by the prosecution, undercut the instruction.
 

 [45]
 

 See DeChant
 
 v.
 
 State,
 
 116 Nev. 918, 927, 10 P.3d 108, 114 (2000) (stating that cumulative effect of errors at trial denied defendant a fair trial).
 

 [46]
 

 541 U.S. 36, 68 (2004).
 

 [47]
 

 120 Nev. 392, 399, 91 P.3d 591, 595 (2004) (holding that a health care professional’s affidavit prepared pursuant to NRS 50.315(4) is admissible only if (1) the health care professional is unavailable to testify at trial, and (2) the defendant had a prior opportunity to cross-examine the health care professional regarding the affidavit). This court withdrew and reissued this opinion.
 
 See City of Las Vegas v. Walsh,
 
 121 Nev. 899, 124 P.3d 203 (2005),
 
 cert. denied,
 
 126 S. Ct. 1786 (2006).
 

 [48]
 

 121 Nev. 706, 714, 120 P.3d 1170, 1175 (2005) (stating that if the statement of an unavailable witness is “testimonial” in nature, the Confrontation Clause requires a prior opportunity for cross-examination concerning the statement for it to be admissible (citing
 
 Crawford,
 
 541 U.S. at 68)).
 

 [49]
 

 See Crawford,
 
 541 U.S. at 60 n.9 (stating that “when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements”).
 

 [50]
 

 See id.
 

 [51]
 

 See
 
 NRS 51.035 (defining hearsay generally as a statement offered into evidence to prove the truth of the matter asserted); NRS 51.065 (stating that hearsay is inadmissible except as otherwise provided).
 

 [52]
 

 See
 
 NRS 48.015 (defining “relevant evidence” as evidence having any tendency to render the existence of any fact of consequence more or less probable than without the evidence); NRS 48.025(2) (stating that irrelevant evidence is inadmissible).
 

 [53]
 

 See
 
 NRS 48.035(1) (stating that even relevant evidence is inadmissible if its probative value is substantially outweighed by the potential for unfair prejudice, confusion of the issues, or misleading the jury).
 

 [54]
 

 See Petty v. State,
 
 116 Nev. 321, 997 P.2d 800 (2000).
 

 [55]
 

 Estes does not otherwise take issue with the use of the preliminary hearing testimony.
 

 [56]
 

 See Petty,
 
 116 Nev. 321, 997 P.2d 800.
 

 [57]
 

 Barton v. State,
 
 117 Nev. 686, 692, 30 P.3d 1103, 1107 (2001);
 
 McIntosh v. State,
 
 113 Nev. 224, 225, 932 P.2d 1072, 1073 (1997).
 

 [58]
 

 Blockburger
 
 v.
 
 United States,
 
 284 U.S. 299, 304 (1932).
 

 [59]
 

 Barton,
 
 117 Nev. at 692, 30 P.3d at 1107;
 
 McIntosh,
 
 113 Nev. at 225, 932 P.2d at 1073.
 

 [60]
 

 McIntosh,
 
 113 Nev. at 226, 932 P.2d at 1073 (quoting
 
 Lisby v. State,
 
 82 Nev. 183, 187, 414 P.2d 592, 594 (1966)).
 

 [61]
 

 McNair
 
 v.
 
 State,
 
 108 Nev. 53, 57, 825 P.2d 571, 574 (1992).
 

 [62]
 

 Braunstein
 
 v.
 
 State,
 
 118 Nev. 68, 79, 40 P.3d 413, 421 (2002).
 

 [63]
 

 Id. at 79-80, 40 P.3d at 421.
 

 [64]
 

 Id. at 79, 40 P.3d at 421.
 

 [65]
 

 NRS 199.305(1) provides the following:
 

 A person who, by intimidating or threatening another person, prevents or dissuades a victim of a crime, a person acting on his behalf or a witness from:
 

 
 *1145
 
 (a) Reporting a crime or possible crime to a:
 

 (1) Judge;
 

 (2) Peace officer;
 

 (3) Parole or probation officer;
 

 (4) Prosecuting attorney;
 

 (5) Warden or other employee at an institution of the Department of Corrections; or
 

 (6) Superintendent or other employee at a juvenile correctional institution;
 

 (b) Commencing a criminal prosecution or a proceeding for the revocation of a parole or probation, or seeking or assisting in such a prosecution or proceeding; or
 

 (c) Causing the arrest of a person in connection with a crime, or who hinders or delays such a victim, agent or witness in his effort to carry out any of those actions is guilty of a category D felony and shall be punished as provided in NRS 193.130.
 

 [66]
 

 See Zabeti v. State,
 
 120 Nev. 530, 537, 96 P.3d 773,
 
 777
 
 (2004) (remanding for the limited purpose of correcting a judgment of conviction, which incorrectly reflected that the defendant was convicted pursuant to guilty plea, when he was in fact convicted pursuant to jury verdict).
 

 [67]
 

 The sentencing transcript indicates that the district court granted Estes 89 days’ credit, but the judgment of conviction granted 898 days’ credit.