JAMES CHAVEZ, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 48847

July 30, 2009

213 P.3d 476

*Jeremy Bosler*, Public Defender, and *John Reese Petty*, Chief Deputy Public Defender, Washoe County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Richard A. Gammick*, District Attorney, and *Joseph R. Plater*, Deputy District Attorney, Washoe County, for Respondent.

Before HARDESTY, C.J., PARRAGUIRRE, DOUGLAS, CHERRY, SAITTA, GIBBONS and PICKERING, JJ.

## OPINION

*Per Curiam:*

In this appeal, we consider whether the preliminary hearing testimony of an unavailable witness may be admitted into evidence at trial without violating the Sixth Amendment Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004). We hold that it

can. We conclude that this issue, along with the other issues that appellant James Chavez raises on appeal, does not warrant reversal of Chavez's conviction and sentence. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

Chavez and Korby Block married in 1993 and together had four children, including their eldest, D.C. Although the couple divorced in 1997, they continued to live together in Block's apartment. In 2004, as Block was driving all four children to an outing, she asked them how it affected them when she and Chavez fought. During the conversation, one of the children told Block that Chavez was doing something to D.C. D.C. then told her mom that Chavez had been sexually molesting her. Block immediately took D.C. to the hospital.

Before D.C. was examined at Northern Nevada Medical Center, police detectives interviewed Block and D.C. There, D.C. told Sergeant Patrick Dreelan of the Reno Police Department that Chavez had sexually assaulted her the day before, forcing her to have intercourse and perform oral sex on him. Sergeant Dreelan then escorted Block and D.C. to the police station where Detective Barbara Armitage interviewed them. D.C.'s interview was videotaped. During the interview, D.C. stated that Chavez had sexually molested her for five years and sometimes she would spit out his semen into a sock. D.C. told Detective Armitage that the day before, when Chavez forced her to perform oral sex on him on the living room couch, she had been wearing a purple top and purple pants. During a second interview with Detective Armitage, D.C. recounted many of the same facts, but also recounted new incidents of sexual abuse. D.C. told the police that the sexual abuse began when she was five years old. D.C. revealed that the injury for which she had to be taken to the hospital when she was five years old, which resulted in her receiving stitches in her vagina, was not the result of a fall on a fence post, but rather because of Chavez sexually molesting her. She further stated that Chavez had used a purple vibrator on her private parts.

With Block's permission, police officers entered Block's apartment and collected evidence, including the purple pants and top, several socks, evidentiary samples from the living room couch, and two vibrators. One of the socks contained adequate saliva and seminal fluid on which to perform DNA tests; those DNA tests revealed that D.C. was the dominant source of saliva and Chavez was the source of the seminal fluid. The other socks tested positive for seminal fluid, though it was not possible to develop a DNA profile. The couch samples, too, showed seminal fluid, but the low level of DNA prevented a determination of the source of the semen. The vibrators tested positive for Block's DNA.

The State charged Chavez with four counts of sexual assault on a child. On August 5, 2004, with almost all of the discovery complete, D.C. testified at a preliminary hearing. At the preliminary hearing, as a result of discovery, Chavez had a copy of D.C.'s videotaped interview with police and a list of the witnesses that the State planned on calling in its case in chief. On direct, D.C. testified about the sexual abuse Chavez committed upon her, including where, when, and how the assaults occurred.

During the preliminary hearing, Chavez, through his attorney, had opportunity to cross-examine D.C. In the course of the cross-examination and recross-examination, not including introductory questions, Chavez asked D.C. 240 questions. Chavez's examination of D.C. was almost twice the length of the State's examination of D.C. Chavez confronted D.C. about the statements she made to the State during direct examination, including repeatedly questioning D.C. about her claims that Chavez had digitally, vaginally, and anally penetrated her during a five-year span. Chavez inquired about the details of the incidents, including where and when they took place, why D.C. did not mention the incidents earlier, and whether any of her siblings ever witnessed the sexual abuse. Chavez asked D.C. about his penis, including its size, description, and feel when he was committing the sexual abuse. He questioned D.C. about the semen and how she would use the sock to clean it off of her. Chavez confronted D.C. about the incident that occurred when she was five years old, when Chavez said D.C. fell on a fence post. He also extensively questioned D.C. about her family life, including her relationship with her mother, Block. Chavez cross-examined D.C. about her feelings toward Chavez, the family's financial issues, their living situation, and Block's feelings about Chavez. He confronted D.C. about statements that she made about the sexual abuse to her mother, family friends, law enforcement, and health care providers. Chavez asked D.C. about her therapy sessions with her therapist, Sally Holt-Evarts. He asked D.C. whether she told Evarts about the sexual abuse and whether Block would sit in on the sessions. Chavez extensively questioned D.C. about her sexual education classes at school, including whether she knew what semen was and how she learned about semen.

During this long cross-examination and recross-examination, the magistrate judge interrupted Chavez only once. The sole interruption occurred when Chavez was questioning D.C. about her mother's new boyfriend, whether he visited, and whether Block was happy with him. The magistrate judge said that he was not going to allow the line of questioning unless counsel explained why it was relevant. Without objection, Chavez moved on to other questions.

After the preliminary hearing, but before trial, D.C. died. The State filed a notice of intent to admit the former testimony of deceased witness D.C. Chavez moved the district court to dismiss the

charges against him. The district court denied Chavez's motion. Further, it granted the State's motion to admit D.C.'s former testimony, reasoning that pursuant to *Crawford*, Chavez had the opportunity to cross-examine D.C. at the preliminary hearing and, as D.C. was now unavailable, her testimony was therefore admissible.

In light of the district court's ruling, Chavez asked the district court that the jury be instructed that D.C. was unavailable and thus preclude witnesses from mentioning that D.C. had died. The court ruled that, pursuant to NRS 51.055(1)(c), Nevada's statute on witness unavailability due to death, the jury could be instructed that D.C. was unavailable because she was deceased but that no other details concerning her death could be admitted.

At trial, Evarts testified that she had nearly 25 years of experience as a family therapist and that child assault victims constituted a quarter of her family therapy practice. Evarts testified that the first time she saw D.C. was three months after D.C. first made the allegations that Chavez had sexually abused her. Evarts said that on that first visit, pursuant to her general practice, she asked D.C. to fill out a form that asked a variety of questions that would help Evarts in treating her. Evarts testified that one question on the form inquired if the patient had ever been to the hospital or required stitches, and D.C.'s answer to that question was that at five years old her dad ripped open her vagina. When asked whether she ever doubted D.C.'s allegations of abuse, Evarts testified that "[she] had no doubt . . . at all that [D.C.] was telling the truth, and [she] didn't think that [D.C.] was coached at all."

Sergeant Dreelan testified that on March 28, 2004, he was dispatched to Northern Nevada Medical Center to respond to a report of sexual assault of a child. Sergeant Dreelan testified that he met D.C. and Block in the waiting area of the hospital. He stated that they both appeared upset and emotional and that D.C. was crying. Sergeant Dreelan testified that he had a conversation with D.C. in which he asked her what had happened. Sergeant Dreelan testified that D.C. told him that her father, Chavez, had forced her to have sex with him and to perform oral sex on him the day before.

Detective Barbara Armitage testified that she interviewed D.C. on two separate occasions. The first interview was conducted on March 28, 2004, and was videotaped. Over defense counsel's objection, the district court allowed the State to play the videotape for the jury. In it, D.C. describes how and when she was sexually molested by her father.

Doctor Ellen Clark, a specialist in clinical and forensic pathology, who performed the autopsy on D.C., testified that the autopsy revealed evidence of repetitive injury to the vaginal area, including a complete absence of a hymen.

Over defense counsel's objection, the district court allowed the State to present D.C.'s preliminary hearing testimony. The State also presented the testimony of all of Chavez and Block's children.

D.C.'s younger brother, T.C., testified that the day he and his siblings were in the car with their mother, he told Block that Chavez was doing "something" to D.C. He testified that he told Block because he wanted D.C. to have a better life and that he had witnessed the sexual abuse once or twice, when he saw D.C. with her head on Chavez's private part. T.C. testified that sometimes Chavez would instruct him and his other siblings to go to the bathroom or their rooms while he and D.C. remained together to clean. T.C. testified that after about a half hour, D.C. would go and "clean her hands and cry."

D.C.'s other brother, B.C., testified that he too knew that Chavez was doing something "suspicious" to D.C. because Chavez would always take D.C. into a room, while asking the rest of the siblings to stay either in the living room, their rooms, or the bathroom. B.C. further testified that once Chavez thought the other children were spying on him and D.C., so Chavez "knocked" out B.C. and slapped his other siblings. B.C. testified that he saw Chavez with his pants down and D.C. with her head between Chavez's legs on one occasion. B.C. admitted that initially he told police that he never saw anything happen between Chavez and D.C. but explained he had been embarrassed to speak of sexual things. When asked why he was being forthcoming now, this exchange took place between B.C. and the prosecutor:

> Q. When you talked to the police that second time and that first time, was [D.C.] still alive?
> A. Yes, I think so.
> Q. . . . How important is it now at this point, with [D.C.] not being here anymore—how does that affect why you're wanting to talk now?
> A. Because since she isn't here, I can, um—I know that she is gone because he—
> Q. Stop.
> . . . .
> Q. I don't want you to blame anybody. Just don't say anything like that.
> Do you feel it's your place to speak for her?
> A. Yes.

The final sibling to testify was D.C.'s sister, D.A.C. She testified that she once saw D.C. on the bed with Chavez on top of her. She further testified that another time she was in the bathroom and D.C. walked in with "white stuff" on her chin and that Chavez told D.C. to wipe her face clean.

Chavez testified that he never sexually molested his daughter D.C. When asked about D.C.'s preliminary hearing testimony, Chavez testified that he did not think that D.C. herself believed everything she was saying at the preliminary hearing. He testified that D.C. fell on the fence post outside their old home when she was

five years old, requiring stitches to her vagina. He further testified that he did not believe the testimony of his other children. Rather, he believed all his children, including D.C., had lied. Chavez denied ever telling any of his children to go to their rooms while he and D.C. stayed together. He further denied physically punishing any of his children, beyond swatting them on their behinds or making them do pushups.

During Chavez's cross-examination, the State sought to introduce evidence of pornographic magazines found under Chavez's bathroom sink during the search of Block's apartment. In a pretrial hearing, the district court ruled the evidence inadmissible. However, the district court noted that during direct examination, "there was a line of questioning and responses that were given that would suggest that [Chavez was] shy or bashful about sexual issues." Thus, the district court ruled that the adult magazines were relevant and allowed the State to question Chavez about the evidence. Chavez answered a series of questions regarding the adult magazines.

During the trial, the district court informed the parties that an alternate juror had expressed her opinion to as many as four other jurors that Chavez was guilty. Chavez immediately moved for a mistrial. The district court decided that a voir dire of each juror would be conducted to determine whether the jury had been tainted. The next day, the district court canvassed each juror. The alternate juror stated that she indeed had expressed her opinion that Chavez was guilty. The district court excused the juror. Three other jurors confirmed that they heard the comment but could remain impartial, while all the other jurors stated they did not hear anyone express an opinion about the ultimate outcome of the case. Accordingly, the district court found that the jury would be able to remain fair and impartial and denied Chavez's motion for a mistrial.

The jury convicted Chavez of four counts of sexual assault on a child. The district court sentenced him to four consecutive terms of life with the possibility of parole beginning after a minimum of 20 years had been served.

On appeal, Chavez assigns numerous trial errors. The most significant issue raised on appeal is whether the admission of D.C.'s preliminary hearing testimony and other statements made to police violated the Sixth Amendment Confrontation Clause. Chavez asserts an additional Confrontation Clause violation in connection with the testimony of D.C.'s therapist, Evarts. Moreover, Chavez assigns several evidentiary errors, challenging the relevance of Dr. Clark's testimony and the reference to the adult magazines found in Chavez's bathroom. Chavez also argues that it was error to admit other bad act evidence with regard to how he punished his children. He further asserts that he is entitled to a new trial because the district court erred when it ruled that, pursuant to NRS 51.055, the jury could be instructed that D.C. was unavailable because she was

deceased. In addition, Chavez argues that the exchange between B.C. and the prosecutor and the instance of juror misconduct warranted a mistrial. Finally, he asserts that the consecutive sentences constitute cruel and unusual punishment.

## DISCUSSION

In resolving Chavez's arguments on appeal, we must first address whether the preliminary hearing process provides an adequate opportunity for the accused to confront the witnesses against him, as is required by the Sixth Amendment's Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004). We conclude that a preliminary hearing can afford a defendant an adequate opportunity to confront witnesses against him pursuant to *Crawford*. The adequacy of the opportunity to confront will be decided on a case-by-case basis, turning upon the discovery available to the defendant at the time and the manner in which the magistrate judge allows the cross-examination to proceed. We find support for our decision in the history and language of the Confrontation Clause and the bedrock principles of the inquisitorial process upon which the United States Supreme Court reached its decision in *Crawford*.

### The Confrontation Clause and Crawford

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As the United States Supreme Court observed in *Crawford*, the scope of the right to confront was addressed just three years after the First Congress adopted the Sixth Amendment in *State v. Webb*, 2 N.C. 103 (1 Hayw. 1794), when a North Carolina court held that "depositions could be read against an accused only if they were taken in his presence." 541 U.S. at 49.

Face-to-face confrontation is the foundation upon which the United States Supreme Court's Confrontation Clause jurisprudence evolved. In *Crawford*, the Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. In so doing, the Supreme Court observed that the Confrontation Clause was a

> procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Id.* at 61.

While much of *Crawford*'s progeny dealt with the definition of "testimonial," *see Davis v. Washington*, 547 U.S. 813 (2006), *Crawford* discussed the Confrontation Clause primarily in terms of unavailability and an opportunity for cross-examination. *See Crawford*, 541 U.S. at 68. *Crawford* is grounded in the principle that the opportunity to cross-examine is the focal point of the right to confront. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 315 (1974) ("'Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination.'" (alteration in original) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965))).

This court's Confrontation Clause jurisprudence mirrors the Court's adherence to the historical roots of the Confrontation Clause. Some 200 years after the *Webb* decision, this court reaffirmed the cornerstone principle of the Confrontation Clause and its guarantee of a face-to-face meeting with an accuser. *Smith v. State*, 111 Nev. 499, 502, 894 P.2d 974, 975 (1995). In *Smith*, we held that the defendant's Sixth Amendment right to confrontation had been violated because the prosecutor blocked the child-victim's view of the defendant on direct examination. *Id.* at 502-03, 894 P.2d at 976. We determined that, even though Smith had an "unfettered opportunity" to cross-examine his accuser, it was not an effective cross-examination because the victim's view of Smith had been blocked. *Id.* at 502, 894 P.2d at 976. In so determining, we noted that "'[i]t is always more difficult to tell a lie about a person "to his face" than "behind his back."'" *Id.* (quoting *Coy v. Iowa*, 487 U.S. 1012, 1019 (1988)).

We have applied *Crawford* to cases before us, stating that the testimonial hearsay of an unavailable witness requires a prior opportunity to cross-examine the witness concerning the statement for it to be admissible. *Flores v. State*, 121 Nev. 706, 714, 120 P.3d 1170, 1175 (2005). Further, we have observed that "'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Pantano v. State*, 122 Nev. 782, 790, 138 P.3d 477, 482 (2006) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). And we have explained that discovery is a component of an effective cross-examination. *See Estes v. State*, 122 Nev. 1123, 1140, 146 P.3d 1114, 1126 (2006).

Today, we further clarify our post-*Crawford* decisions by holding that a preliminary hearing can afford a defendant an opportunity for effective cross-examination. We will determine the adequacy of the opportunity on a case-by-case basis, taking into consideration such factors as the extent of discovery that was available to the defendant

at the time of cross-examination and whether the magistrate judge allowed the defendant a thorough opportunity to cross-examine the witness. We first address the standard of review for such a claim and then address each of Chavez's claims in turn.

### Standard of review

We generally review a district court's evidentiary rulings for an abuse of discretion. *See, e.g., Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). However, whether a defendant's Confrontation Clause rights were violated is "ultimately a question of law that must be reviewed de novo." *U.S. v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007); *see U.S. v. Holt*, 486 F.3d 997, 1001 (7th Cir. 2007); *U.S. v. Kenyon*, 481 F.3d 1054, 1063 (8th Cir. 2007); *U.S. v. Townley*, 472 F.3d 1267, 1271 (10th Cir. 2007); *U.S. v. Hitt*, 473 F.3d 146, 155-56 (5th Cir. 2006).

### D.C.'s preliminary hearing testimony and statements to law enforcement

Chavez challenges the admission of D.C.'s preliminary hearing testimony, her videotaped statements to police, and her other statements to law enforcement officers. We first address whether the district court erred in admitting D.C.'s preliminary hearing testimony.

The threshold question in the *Crawford v. Washington* framework is whether the statement at issue is "testimonial" hearsay. 541 U.S. 36, 68-69 (2004). While *Crawford* "leave[s] for another day" the definition of "testimonial," it did observe that "it applies at a minimum to prior testimony at a preliminary hearing." *Id.* at 68. Accordingly, D.C.'s testimony at the preliminary hearing was testimonial. Further, because D.C. was deceased at the time of trial, she was an unavailable witness. Thus, the primary issue before this court is whether Chavez had an opportunity for an effective cross-examination at the preliminary hearing.

Chavez argues that the limited nature of a preliminary hearing does not provide a defendant an adequate opportunity to cross-examine a witness appearing against him. He urges this court to adopt the standards set forth in *People v. Fry*, 92 P.3d 970 (Colo. 2004), and *State v. Stuart*, 695 N.W.2d 259 (Wis. 2005). Both cases are inapposite.

In *Fry*, the Colorado Supreme Court found that a defendant's opportunity to cross-examine a witness during a preliminary hearing was not adequate for Confrontation Clause purposes because of

"the limited nature of the preliminary hearing" in that state. 92 P.3d at 976-77 (explaining that in Colorado a "preliminary hearing is limited to matters necessary to a determination of probable cause"). In contrast, Nevada law is generally more permissive with regard to a defendant's right to discovery and cross-examination at the preliminary hearing. *See* NRS 171.196(5) ("The defendant may cross-examine witnesses against him and may introduce evidence on his own behalf."); NRS 171.1965(1) (stating that, before the preliminary hearing, the defendant is entitled to written or recorded statements by the defendant or a witness, reports, and other evidence within the prosecutor's custody or possession). We do not find anything in our state law that would hinder a defendant's opportunity to cross-examine a witness at a preliminary hearing.[1]

In *Stuart*, the Wisconsin Supreme Court reversed a murder conviction, finding that the district court had erroneously admitted the preliminary hearing testimony of the defendant's brother. 695 N.W.2d at 267. During the preliminary hearing, the magistrate ruled that pursuant to Wisconsin law, the defense could not ask the brother a question that was meant to cast doubt on the brother's credibility at the preliminary hearing stage. *Id.* At trial, the brother became unavailable, and the court admitted his preliminary hearing testimony. *Id.* The Wisconsin Supreme Court reversed, determining that, at the trial level, a defendant had a right to question a witness's motive and credibility and, therefore, admitting the preliminary testimony violated the defendant's right to confrontation. *Id.*

Unlike Wisconsin, Nevada law does not preclude a defendant from questioning a witness's credibility or motive during a preliminary hearing. While the defendant in *Stuart* could not question the witness's credibility and motive, Chavez questioned D.C.'s credibility in a wide-ranging cross-examination.

Chavez's cross-examination of D.C. at the preliminary hearing consisted of almost double the amount of questions that were asked on direct examination. D.C. testified under oath and in Chavez's

---

[1]Chavez cites *Sheriff v. Witzenburg*, 122 Nev. 1056, 1061, 145 P.3d 1002, 1005 (2006), for the proposition that in Nevada preliminary hearings do not afford sufficient opportunity for cross-examination. This argument misreads the case. In *Witzenburg*, this court held that the statutory grant of cross-examination at a preliminary examination pursuant to NRS 171.196(5) was a qualified right, subject to NRS 171.197, which provides the defendant with a mechanism to challenge affidavit testimony that the State attempts to introduce against him. *Id.* at 1062, 145 P.3d at 1006. Contrary to Chavez's assertion, *Witzenburg* does not hold that Nevada's preliminary hearing procedures limit a defendant's cross-examination rights to such an extent that Confrontation Clause rights cannot be satisfied. This court held to the contrary in *Aesoph v. State*, 102 Nev. 316, 319-20, 721 P.2d 379, 381-82 (1986). In this pre-*Crawford* decision, we specifically held that cross-examination during a preliminary hearing could satisfy the Confrontation Clause, a proposition which we extend today post-*Crawford*. *Id.*

presence. At the time Chavez conducted the cross-examination, nearly all the discovery was complete. In fact, most of Chavez's extensive cross-examination consisted of questions based upon statements that D.C. had made to authorities about the sexual abuse. Specifically, we note that Chavez had a copy of D.C.'s videotaped statements to police, as well as a list of the witnesses that would be testifying during the State's case in chief. Therefore, Chavez had most, if not all, of the pertinent facts of the State's case in chief at the preliminary hearing.

Chavez used the discovery to ask D.C. specific questions about the molestation, including details about each instance of abuse, the description of her father's penis, and how she cleaned up afterwards by using socks. He questioned D.C.'s veracity and motives by repeatedly asking her whether she told specific people about the sexual abuse during the five years that it was ongoing. Chavez asked D.C. whether her brothers or her sister ever saw the sexual abuse and about the conversation in the car between D.C., her siblings, and Block, and how and why D.C. told her mother about the abuse. Chavez asked D.C. specific questions about her parents' relationship. He further questioned D.C. about the alleged accident on the fence post and how it led to her initial injuries. He even asked D.C. if she was seeing a therapist.

These questions were only part of the 240 questions Chavez asked D.C. The record leaves no doubt in our minds that the preliminary hearing afforded Chavez an opportunity to cross-examine the unavailable witness, D.C., on the statements that she had made to her mother, health care providers, and law enforcement officers regarding the sexual abuse. The nature of the cross-examination was extensive and thorough because the defense took, and the magistrate judge allowed, full advantage of the opportunity to cross-examine. In fact, the magistrate judge only interrupted Chavez's cross-examination once, when Chavez asked D.C. a series of questions about her mother's new boyfriend. And, even then, the magistrate judge said that he would not allow the line of questioning unless counsel could explain its relevance. Chavez simply moved on to other questions. There is no evidence that the magistrate judge placed any inappropriate restrictions on the scope of Chavez's cross-examination of D.C. Rather, the record shows, save for one appropriate admonishment, the magistrate judge allowed Chavez to extensively question D.C. on all the key pieces of evidence the State had obtained against Chavez. Because discovery was almost entirely complete, Chavez was able to take full advantage of the opportunity to cross-examine the State's key witness against him at the preliminary hearing.

Therefore, in this instance, because the discovery was almost entirely complete and the magistrate judge allowed Chavez unrestricted opportunity to confront D.C. on all the pertinent issues, we con-

clude that Chavez's Confrontation Clause rights were not violated by the admission of D.C.'s preliminary hearing testimony at trial.

### D.C.'s other statements to law enforcement

In concluding that the admission of D.C.'s preliminary hearing testimony did not violate Chavez's rights pursuant to the Confrontation Clause and *Crawford*, we also conclude that the admission of D.C.'s videotaped testimony and other statements she made to officers did not violate Chavez's constitutional rights.

There is no question that the statements were testimonial in nature because D.C. made them to police in a formal, nonemergency setting and the interviews were conducted for the primary purpose of helping law enforcement build a case of sexual abuse against Chavez. *Davis v. Washington*, 547 U.S. 813, 822 (2006) (explaining that nontestimonial statements are those made during an ongoing emergency; whereas, testimonial statements are those made during an interrogation that serve the primary purpose of helping establish or prove past events "potentially relevant to later criminal prosecution").

The only remaining issue is whether Chavez had opportunity to cross-examine D.C. regarding the videotaped testimony and her other statements to police. Because of discovery, Chavez had the statements that D.C. made to Detective Armitage and Sergeant Dreelan, including a copy of the videotape, before the preliminary hearing. Chavez, therefore, had the opportunity to confront D.C. on all of her statements to law enforcement officers at the preliminary hearing. Whether he questioned D.C. on each and every statement is not the relevant inquiry, as the Confrontation Clause only guarantees the opportunity to cross-examine, not a cross-examination in whatever way the defense might wish. As we have already concluded, Chavez was afforded an adequate opportunity to confront D.C. at the preliminary hearing. The breadth and scope of Chavez's cross-examination did not run afoul of the Confrontation Clause because of the nearly complete discovery available to Chavez at the time and manner in which the magistrate judge allowed the cross-examination to proceed.

### Other testimonial hearsay

Chavez next argues that his Confrontation Clause rights were violated when D.C.'s therapist, Evarts, was allowed to testify as to how D.C. had answered a question on a medical form. Evarts testified that D.C. wrote that at "five years old, her dad ripped open her vagina."

We first consider *Crawford*'s threshold question of whether the statement being offered is testimonial in nature. While we acknowl-

edge that the police likely referred D.C. to Evarts, there is no evidence that Evarts' time with D.C. served the purpose of furthering the investigation of D.C.'s sexual abuse allegations. Rather, their time together served the primary purpose of helping D.C. psychologically heal from five years of abuse. One quarter of Evarts' practice was made up of child assault victims. Her general practice was to have patients fill out a medical form upon their first visit. The question that elicited the response at issue did not ask anything specific about an act of sexual assault. Rather, it asked if the patient had been to the hospital or required stitches. Given the context in which it was asked, by a family therapist specializing in sexual assault victims and for the purpose of diagnosis and treatment, we conclude that D.C.'s written statement was not testimonial.

Having concluded that D.C.'s statement was nontestimonial in nature, we must next determine whether it was admissible pursuant to a hearsay exception. NRS 51.115 provides for the admission of hearsay statements ''made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof.'' In essence, statements that are pertinent to the ongoing care of the patient are admissible pursuant to NRS 51.115. *See Koerschner v. State*, 116 Nev. 1111, 1118, 13 P.3d 451, 456 (2000).

We conclude that Evarts' testimony regarding D.C.'s answer that her father ripped open her vagina is admissible nontestimonial hearsay pursuant to NRS 51.115. The question was asked and answered in the context of medical/psychological treatment for sexual assault. As Evarts testified, the question was part of a medical form that all new patients routinely fill out to give Evarts an introduction to the patient for treatment and diagnosis. D.C. was at Evarts' office as a victim of sexual assault, and it was in that capacity that she filled out the form and made the statement. We therefore conclude that the district court did not abuse its discretion in allowing Evarts to testify as to D.C.'s statement on the medical form.[2]

*Evidentiary issues*

Chavez next raises several evidentiary issues. He contends that the district court abused its discretion when it admitted nonrelevant yet

---

[2]Chavez further objects to Evarts' testimony that she had ''no doubt . . . [D.C.] was telling the truth'' or that D.C. had not been ''coached.'' Chavez did not object at the time of the testimony. Rather, he moved for a mistrial the next day, alleging impermissible vouching on Evarts' part. On appeal, he argues that the district court abused its discretion when it denied his motion for a mistrial. Chavez's argument is without merit. In reviewing the district court's denial of a motion for a mistrial, we will reverse the decision only if there is a clear demonstration that the district court abused its discretion. *Rose*

highly prejudicial evidence at trial, namely, evidence of adult magazines found in his bathroom and evidence of prior bad acts.[3]

### Adult magazines

The district court initially ruled that any evidence or reference to the adult magazines found during the search of Block's apartment was inadmissible. However, after noting that Chavez conveyed a shy attitude toward sexual issues on direct examination, the district court allowed the State to question Chavez about the adult magazines.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" and is generally admissible. NRS 48.015; NRS 48.025. However, relevant evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035(1). As previously indicated, we review a district court's decision to admit or exclude evidence for abuse of discretion. *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008).

We fail to see the relevance of the adult magazines because they have no tendency to make the existence of any fact of consequence as to whether Chavez molested his daughter more or less probable. Thus, we conclude that the district court abused its discretion by admitting evidence regarding the adult magazines. While the probative value was minimal at best and unrelated to the elements of the crimes charged, we conclude that the introduction of the adult magazines was harmless error, given the overwhelming evidence pre-

_____

*v. State*, 123 Nev. 194, 206-07, 163 P.3d 408, 417 (2007). Evarts did not vouch for D.C.'s credibility in terms of the allegations in this case. A close review of the trial transcript reveals that Evarts was responding to a question by the State about whether she felt D.C. had been coached. The question was asked because Evarts earlier had testified that, in her experience, she had treated kids that she felt had been "coached[ ] or [had] falsely accused . . . their dads." Thus, Evarts' testimony went to her observations of D.C. as compared to other children she had treated, not to the veracity of D.C.'s allegations. We conclude that the district court did not abuse its discretion in denying Chavez's motion for a mistrial.

[3]Chavez also asserts that the testimony of Dr. Clark, who performed the autopsy on D.C., was not relevant because it was cumulative and highly prejudicial. Chavez did not make a contemporaneous objection and we therefore need not consider this claim. *McKague v. State*, 101 Nev. 327, 330, 705 P.2d 127, 129 (1985). However, in exercising our discretion to consider the claim under a plain error review pursuant to *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003), we determine that Chavez has failed to demonstrate a miscarriage of justice. As a practical matter, we note that Dr. Clark's testimony was highly probative, since it helped corroborate D.C.'s testimony that she had been sexually assaulted repeatedly over a number of years.

sented by the State against Chavez. *See, e.g.*, *Estes v. State*, 122 Nev. 1123, 1141, 146 P.3d 1114, 1126 (2006) (determining that the introduction of a photograph at trial of the minor sexual assault victim was harmless error "given the overwhelming evidence" presented against defendant).

### Prior bad acts

Chavez also argues that he is entitled to a new trial because the district court abused its discretion when it admitted evidence of prior bad acts in the form of testimony by his three children that he had physically abused them.

"A district court's decision to admit or exclude evidence of prior bad acts rests within its sound discretion and will not be reversed by this court on appeal absent manifest error." *Somee v. State*, 124 Nev. 434, 446, 187 P.3d 152, 160 (2008).

For evidence of prior bad acts to be admissible, the district court must hold a hearing outside the presence of the jury and determine " 'that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.' " *Diomampo v. State*, 124 Nev. 414, 430, 185 P.3d 1031, 1041 (2008) (quoting *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997)). If evidence of the prior bad act is admitted, the district court must then issue a limiting instruction to the jury about the limited use of bad act evidence, unless waived by the defendant. *See, e.g.*, *Mclellan*, 124 Nev. at 269-70, 182 P.3d at 110-11.

Here, the district court conducted a pretrial hearing on the State's notice of intent to admit prior bad act evidence. It asked for the specific instances of conduct that the State wished to introduce and reserved ruling on the matters until trial. At trial, B.C. was the only child who testified to any prior bad acts by Chavez. B.C. testified that on one occasion Chavez "knocked" him out and slapped his other siblings because Chavez thought they were all spying on him and D.C. while the two were in the bedroom. We note that B.C. testified under oath and appeared to be a credible witness. Further, the prior bad act was relevant to show B.C.'s fear of Chavez and why B.C. did not initially report the sexual abuse he had witnessed. Moreover, the district court instructed the jury about the limited use of the prior bad act. We therefore conclude that there was no manifest error in the district court's decision to admit B.C.'s testimony regarding a prior bad act.

*Prejudicial exchange between prosecutor and witness*

Chavez argues that the district court committed reversible error when it denied his motion for a mistrial based upon the exchange between the prosecutor and B.C. in which B.C. alluded to D.C.'s death. Prior to trial, the district court ruled that the parties could not discuss the cause or circumstances of D.C.'s death.[4] Chavez asserts that the exchange between the prosecutor and B.C. violated that court order and educated the jury to the fact that at least one sibling blamed Chavez for D.C.'s death. The exchange occurred on re-direct. We note that the prosecutor was trying to rehabilitate B.C., because during cross-examination, Chavez questioned B.C.'s motivation as to why he was more forthcoming at trial, when he had repeatedly told investigators he had not seen any instances of sexual abuse of D.C. by Chavez.

We conclude that the exchange did not violate the district court order not to discuss the circumstances of D.C.'s death. At most, it revealed that B.C. knew that D.C. was deceased—a fact of which the jury was already aware.[5] Further, the district court instructed the jury not to speculate about D.C.'s death and that anything counsel said was not evidence. Because "this court generally presumes that juries follow district court orders and instructions," *Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006), we conclude the district court did not abuse its discretion when it denied Chavez's motion for a mistrial based on the exchange between the prosecutor and B.C.

*Juror misconduct*

Chavez further contends that reversal is required because of juror misconduct. We disagree.

We review a district court's decision to deny a motion for a mistrial based upon juror misconduct for an abuse of discretion. *Valdez*

---

[4]Because of the sensitive nature of the cause of death, the district court forbade any reference to the manner of D.C.'s death.

[5]Regarding D.C.'s unavailability, Chavez also argues that the district court abused its discretion when it, pursuant to NRS 51.055(1)(c), informed the jury that D.C. was unavailable because she was deceased. NRS 51.055(1)(c) states, in pertinent part, that "[a] declarant is 'unavailable as a witness' if he is: . . . [u]nable to be present or to testify . . . because of death." The statute does not speak to whether the jury can be informed as to why the declarant is unavailable. However, we note that the district court created a safeguard when it permitted the jury to be instructed regarding D.C.'s unavailability by ordering that nothing beyond the fact that she was deceased, such as the circumstances of her death, would be conveyed to the jury. We conclude that the measure taken was sufficient to protect Chavez's rights. Further, we note that informing the jury

*v. State*, 124 Nev. 1172, 1186, 196 P.3d 465, 475 (2008). We have held that a district court has discretion to remove a juror mid-trial for violating a court's admonishment, rather than declaring a mistrial. *Viray v. State*, 121 Nev. 159, 163, 111 P.3d 1079, 1082 (2005). Specifically, we have stated that:

> [i]n exercising its discretion, a district court must conduct a hearing to determine if the violation of the admonishment occurred and whether the misconduct is prejudicial to the defendant. Prejudice requires an evaluation of the quality and character of the misconduct, whether other jurors have been influenced by the discussion, and the extent to which a juror who has committed misconduct can withhold any opinion until deliberation.

*Id.* at 163-64, 111 P.3d at 1082.

In this case, the district court properly determined that the violation of the admonishment occurred when the alternate juror expressed her opinion to the other jurors that she believed Chavez was guilty. The district court proceeded in accord with *Viray* and held a hearing to determine the nature and quality of the misconduct, conducting a voir dire of each juror to determine whether the jury had been tainted. After canvassing each juror, the district court excused the alternate juror, who had expressed her opinion that Chavez was guilty. While three other jurors confirmed that they heard the alternate juror's comment, they stated that they could remain impartial. All the other jurors stated that they did not hear anyone express an opinion about the ultimate outcome of the case. Accordingly, a mistrial was not required. We, therefore, conclude that the district court properly exercised its discretion to remove the alternate juror for violating its order not to discuss any opinion about the trial until the case was submitted to the jury.

*Cruel and unusual punishment*

Chavez contends that the sentence he received constitutes cruel and unusual punishment, in violation of the United States and Nevada Constitutions because the sentence was excessive. The district court sentenced Chavez to four consecutive life terms.

The Eighth Amendment of the United States Constitution does not require strict proportionality between crime and sentence but forbids only an extreme sentence that is grossly disproportionate to the

---

that D.C. was unavailable because she is deceased was relevant as to why she did not testify. *See U.S. v. Accetturo*, 966 F.2d 631, 637 (11th Cir. 1992) (observing that the fact that the declarant was unavailable because she was dead was relevant as to why she had not testified).

crime. *Harmelin v. Michigan*, 501 U.S. 957, 1000-01 (1991) (plurality opinion). Regardless of its severity, a sentence that is within the statutory limits is not " 'cruel and unusual punishment unless the statute fixing punishment is unconstitutional or the sentence is so unreasonably disproportionate to the offense as to shock the conscience.' " *Blume v. State*, 112 Nev. 472, 475, 915 P.2d 282, 284 (1996) (quoting *Culverson v. State*, 95 Nev. 433, 435, 596 P.2d 220, 222 (1979)); *see also Glegola v. State*, 110 Nev. 344, 348, 871 P.2d 950, 953 (1994).

This court has consistently afforded the district court wide discretion in its sentencing decision. *See Houk v. State*, 103 Nev. 659, 664, 747 P.2d 1376, 1379 (1987). This court will refrain from interfering with the sentence imposed "[s]o long as the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence." *Silks v. State*, 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976).

In the instant case, Chavez does not allege that the district court relied on impalpable or highly suspect evidence or that the relevant statutes are unconstitutional. Further, we note that the sentence imposed was within the parameters provided by the relevant statutes. *See* NRS 176.035(1); *Warden v. Peters*, 83 Nev. 298, 303, 429 P.2d 549, 552 (1967). Accordingly, we conclude that the sentence imposed does not constitute cruel and unusual punishment and, therefore, the district court did not abuse its discretion by imposing on Chavez a sentence of four consecutive life terms.

## CONCLUSION

For the reasons discussed above, we reject all of Chavez's arguments on appeal and affirm the district court's judgment of conviction. In so doing, we clarify our Confrontation Clause jurisprudence post-*Crawford*, holding that a preliminary hearing can afford a defendant an adequate opportunity to confront witnesses against him. The adequacy of the opportunity will be determined on a case-by-case basis, determined by such considerations as to how much discovery was available to the defendant at the time of the cross-examination and the manner in which the magistrate judge allows the cross-examination to proceed.